IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DIGITAL ALLY, INC., )
)
Plaintiff, )
)
)
v. )   Case No. 2:16-cv-02032
)
TASER INTERNATIONAL, INC., )
)
Defendant. )
)
_____ )

**SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT, COMMERCIAL BRIBERY, CONTRACTS, COMBINATIONS AND CONSPIRACIES IN RESTRAINT OF TRADE AND UNFAIR OR ANTI-COMPETITIVE ACTS AND PRACTICES**

Digital Ally, Inc. ("Digital Ally" or "Digital") alleges and states its claims for relief against Defendant TASER International, Inc. ("TASER") as follows:

**PARTIES AND JURISDICTION**

1.     Digital Ally is a Nevada corporation having its principal place of business at 9705 Loiret Blvd., Lenexa, Johnson County, Kansas 66219.

2.     TASER is a Delaware corporation having its principal place of business at 17800 North 85th Street, Scottsdale, Arizona 85255.

3.     This Court has subject matter jurisdiction herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1332, 1337 and 1338(a) for the reasons that:

    a.     This is an action arising under the patent laws of the United States, 35 U.S.C. §§ 101, *et seq.*;

    b.     This is an action arising under the laws of the United States protecting trade and commerce against restraints and monopolies, 15 U.S.C. § 1, *et seq.*;

       c.     This is an action between citizens of different states wherein the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.     This Court has personal jurisdiction over TASER. TASER currently is making, using, offering for sale, and selling the infringing product—the AXON cameras with Signal technology. TASER's own website states the "Axon Signal is available and in use by agencies today." Ex. A (TASER's Axon Signal website). TASER's most recent sale appears to have been made in November 2015 and included an order for 2,200 Axon Flex body cameras "equipped with Axon Signal" by the San Antonio Police Department. Ex. B (Taser Press Release). Other sales efforts of the infringing products by TASER currently are underway, including sales in the State of Kansas. In fact, TASER has regularly conducted and does regularly conduct business within the State of Kansas. For example, TASER hosted a "Tech Talk" on May 20, 2015 in Overland Park, KS. Ex. C. According to Ex. C, the event included a panel discussion with Kansas-based law enforcement officers sharing the experience of their agencies using TASER's AXON body cameras. *Id.* (indicating that the Johnson County Sheriff's Office and Topeka Police Department have deployed TASER AXON technology). On information and belief, TASER has additionally sold, offered for sale, and/or used the accused AXON camera with Signal technology in the State of Kansas. For example, as of July 7, 2015, TASER sold and/or offered to sell the Wichita police department AXON cameras with Signal technology. *See, e.g.,* Ex. D (indicating that Wichita's contract with TASER included "free technology upgrades . . . [t]hat could include 'auto on' functions.").

5.     On information and belief, TASER also is subject to this Court's specific and general personal jurisdiction, pursuant to due process and/or the Kansas Long Arm Statute, due at least to its substantial ongoing business activities in this forum, including regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial

revenue from goods and services provided to persons or entities in Kansas and this District. On information and belief, TASER maintains and operates websites on the Internet, including http://www.taser.com and http://www.axon.io, which are operational twenty-four (24) hours a day, seven days a week, are accessible to and regularly accessed by residents of this District and other persons throughout the United States, and through which TASER promotes and advertises its infringing products and directs consumers to purchase its infringing products. On information and belief, TASER also has sales representatives responsible for conducting business and making sales in Kansas and in this District. On information and believe, TASER, through its websites and/or sales representatives, has repeatedly transacted business with customers throughout the United States, including customers within Kansas and this District, and has advertised, promoted, sold, and shipped infringing products into this District without Digital Ally's authorization or permission. Further, on information and belief, TASER has derived substantial revenue from interstate commerce and has interjected itself into this District by its operation of a nationwide business through commercial websites and sales representatives whereby TASER has sold, offered for sale, continued to sell, and continued to offer for sale infringing products. Thus, this Court's exercise of jurisdiction over TASER will not offend traditional notions of fair play and substantial justice.

6.     Further, TASER is subject to service of process and to the exercise of personal jurisdiction herein for the reasons that, *inter alia*:

      a.     This is a suit, action or proceeding under the anti-trust laws of the United States and, having transacted business therein, TASER may be found in the District of Kansas within the meaning of 15 U.S.C. § 22;

      b.     TASER has transacted business in the state of Kansas within the meaning of K.S.A. § 60-308(b)(A), out of which Digital's claims each arise;

      c.     TASER has committed tortious acts in this state within the meaning of K.S.A. § 60-308(b)(B) for the reasons that the acts of patent infringement,

breaches of duty, violations of statute and/or unfair and anti-competitive acts or practices which are the subject of Digital's claims were known by TASER to have; were expected and intended by TASER to have and have had, in fact, the effect of injuring Digital in the state of Kansas;

d.      TASER possesses and maintains contacts with the state of Kansas of a kind and character sufficient to support in personam jurisdiction over it consistent with the Constitutions of the United States and of the State of Kansas, within the meaning of K.S.A. § 60-308(b)(L); and

e.      TASER has otherwise engaged in substantial, continuous and systematic contact with the state of Kansas of a kind and character sufficient to support the exercise of in personam jurisdiction over it, consistent with the Constitutions of the United States and of the State of Kansas.

7.      Venue is proper in the District of Kansas under 28 U.S.C. §§ 1391(b)-(c) and 1400(b). Upon information and belief, TASER has transacted business in this district and has committed, and continues to commit, wrongful acts and acts of patent infringement in this district.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.   Digital Ally

8.      Digital Ally was established in 2004 with a single goal—develop and manufacture cutting-edge technology that provides law enforcement officers with the ultimate event recording capabilities, coupled with convenience and ease of use. The founders of Digital Ally knew that providing better event recording systems would protect both the public and the law enforcement officers.

9.      Headquartered in Lenexa, Kansas, Digital Ally revolutionized mobile video by introducing a complete video system integrated into a rear-view mirror that provided an event recording system that was both user-friendly and reliable. This system was an immediate success and has been adopted across the country.

10.     Since its inception, Digital Ally has expanded its business into the body worn camera industry. While the body-worn camera industry for law enforcement was in its infancy, Digital Ally recognized a severe limitation in the marketplace—the existing devices required manual activation and manual management of multiple devices. Requiring officers to manually manage their entire ecosystem of recording devices was distracting and particularly undesirable in dangerous situations. Additionally, it was often impractical for an officer to manually activate multiple event-recording devices when engaging emergency scenarios, which significantly decreased the usefulness of existing multiple recording device systems. Even in situations where an officer was able to manually activate multiple devices, these devices were not synchronized in any meaningful way and the recordings differed in their start times, all of which made forensically corroborating multiple recordings difficult and time consuming.

11.     Digital Ally's solution solved all these problems and has resulted in a series of patent applications filed with the United States Patent Office. After thorough examinations, the Patent Office agreed that Digital Ally's solutions represented pioneering inventions in this field and patents have been granted that cover, in various forms, an automated system that links and automatically manages all recording devices in an event-capture ecosystem, including body-worn, in-car, and weapon-integrated cameras, and many other recording devices. These patents include U.S. Patent Nos. 8,781,292 ("the '292 Patent") and 9,253,452 ("the '452 Patent").

12.     The technology described in these patents is embodied in Digital Ally's VuLink products. The VuLink product was pioneering because it fully integrated the event-capture ecosystem for an officer's multiple recording devices. With Digital Ally's patented VuLink technology, all recording devices are automatically and simultaneously activated through a wireless network based on a triggering event (e.g., activating a police cruiser's light bar or siren,

manually activating a single recording device, removing a shotgun from the holding rack, activating a smart weapon, a vehicle crash, etc.). Moreover, these multiple recordings are digitally synchronized, which allows officers and prosecuting attorneys to accurately recreate crime scenes in a way that aids admissibility at trial. This technology has been a resounding success and it is on track to be a standard feature requested by nearly all law enforcement departments across the country.

**B.     Taser**

13.     TASER is best known in commerce for its non-lethal, "conducted electrical weapons" or "CEWS".  Over time, however, TASER has attempted to diversify its portfolio by entering the body-worn camera market, including body-worn cameras sold under the AXON brand.

14.     TASER's AXON line of cameras originally included the BODY, a body-worn camera, and the FLEX, a point of view or glasses-mounted camera. Upon release, these cameras were not part of an overall recording system ecosystem and were "dumb" devices that required manual activation.

15.     TASER recognized the shortcomings of these manual activation cameras and knew it needed something more to capitalize on the rapidly growing body-worn camera industry. Indeed, TASER itself noted that "[a]nybody can make a camera. That's not the trick. The trick is: Can you make an ecosystem … to get police into that 21st century mindset?" (Quote from Steve Tuttle, TASER Spokesman: https://www.washingtonpost.com/news/wonk/wp/2014/12/03/the-body-camera-industry-is-feeling-phenomenal-after-ferguson/) (also attached at Ex. E).

16.     On information and believe, TASER was unable or unwilling to develop its own ecosystem and, therefore, it copied Digital Ally's patented technology, claiming it as its own. TASER refers to the resulting product as the "Axon Signal," which will work with the Axon

BODY 2, the Axon FLEET, Axon FLEX, and the TASER smart weapon to "automatically activate[] your Axon cameras to ensure that vital footage is recorded. Linked to many common triggers, Axon Signal lets you capture important footage without lifting a finger." (http://www.axon.io/products/signal) (also attached at Ex. A).   Similarly, TASER's Signal Performance Power Magazine (SPPM) is an integral accessory compatible with a number of TASER smart weapons that "automatically turns on Axon cameras when officers activate their [smart weapon]." The SPPM is "[p]owered by Axon Signal technology [and] uses a secure wireless connection to activate all Axon cameras within range." Ex. F, TASER Smart Weapon Accessories Webpage.

17.     TASER's own statements, press releases, and website blog make clear that it used Digital Ally's pioneering patented technology as the basis for its Axon Signal product. For example, TASER recently admitted that its system "built upon the old technology described in the Digital Ally patent." Ex. G (copy of TASER's blog on November 13, 2015).

18.     TASER later deleted this admission that its own Axon system is built on Digital Ally's patented technology and replaced it with another statement. Ex. H (copy of TASER's blog, reissued shortly after the original, showing the removal of the language admitting it used Digital Ally's patent as a building block for the Axon Signal).

19.     TASER is now using Digital Ally's patented technology to unfairly and improperly compete against Digital Ally in the marketplace. Additionally, Digital Ally believes many of the contracts TASER has been awarded for its Axon Signal products are the result of improper, unethical, and/or unfair means. As recently as 2015, TASER's approach to the marketplace has raised ethical questions in connection with the sales of Axon Signal products where TASER appears to have offered lucrative favors in exchange for ongoing contracts. For

example, TASER's contracts with Albuquerque, Fort Worth, and Salt Lake City have come under fire for offering the departments lucrative favors in exchange for ongoing contracts for Axon products, many of which incorporate or will incorporate the infringing Axon Signal technology. Ex. I (Albuquerque Journal Article from April 30, 2015), Ex. J (Star-Telegram Article from March 4, 2015), and Ex. K (The Salt Lake Tribune Article).

20.    Presumably in recognition of its willful infringement, TASER challenged the validity of Digital Ally's '292 patent through a reexamination proceeding at the United States Patent Office. Through this proceeding, TASER submitted its best arguments that the '292 patent is invalid and exhausted the best prior art available. TASER placed significant importance in this reexamination and, on a number of occasions, prematurely informed the market that its reexamination was successful. Ex. L (TASER's premature press release with inaccuracies on the status of the '292 patent); Ex. M (Digital Ally's clarifying press release).

21.    Ultimately, TASER's arguments failed and the '292 patent issued with a certification from the United State Patent Office that the reexamined claims are valid.

22.    On November 10, 2015, the Patent Office reaffirmed that Digital Ally is entitled to patent protection for its groundbreaking technology described and claimed in the '292 patent. The substantive proceedings before the Patent Office are now concluded and they cannot be appealed. TASER must now answer for infringing Digital Ally's patent rights.

23.    On February 2, 2016, the Patent Office issued the '452 Patent to Digital Ally. The '452 Patent was issued over the prior art that TASER used to attack Digital Ally's '292 Patent in the above referenced reexamination proceeding. The USPTO considered TASER's best prior art and found it insufficient.

### C.    Taser's **Sale, in Commerce, in Substantial Amounts and in Competition with Digital Ally of Body-Worn/Wearable Video Recording Devices**

24.    Digital, TASER and perhaps twenty (20) other competing manufacturers are engaged in the design, manufacture and sale of "body cams": small digital cameras that can be attached to the wearer's clothing or worn as a headset and which will then record events audiographically:

a.    In their usual form, body cams are designed to be and are capable of recording and retaining audiographic data of "evidence grade" and are or may be designed—as invented and patented by Digital Ally—to begin recording, automatically, without the necessity of human agency/deliberate activation;

b.    Law enforcement agencies and/or security services who wish or are required to record the performance of official duties by their officers/personnel are the principal and virtually exclusive consumers/end users of body cams, whether manufactured and sold by TASER, by Digital or by other manufacturers;

c.    Whether manufactured by Digital, TASER or other manufacturers thereof, body cams are neither fungible nor reasonably-interchangeable with other videographic and/or audiovisual recording devices, whether used by law enforcement agencies or otherwise commercially available for the reasons that, *inter alia*:

i.    Videographic/audiovisual recording devices otherwise available commercially are not acceptable substitutes for body cams, whether as a result of excessive size, weight, lack of portability, lack of hands-free operation, lack of durability/resistance to casualty, lack of automatic actuation and/or lack of the ability to effect immediate or simultaneous download, by wireless means, of the images, audio and other data so recorded;

ii.    Videographic/audiovisual recording devices otherwise available commercially do not provide or produce the "evidence grade" images and audio which is an essential feature of any body cam for the reason that they lack the software, firmware, programs and/or devices, the purpose of which is to produce time-stamped images/audio incapable of surreptitious erasure, rerecording and/or alteration;

iii.    Other videographic/audiovisual recording devices used by law enforcement authorities which do produce images and audio of

evidence grade, notably in-car video systems or "dash cams" are not reasonable substitutes for body cams for the reasons that they are capable only of recording events occurring at, in or near the motor vehicles in which they are installed and cannot be dismounted and carried or conveniently dismounted and carried by law enforcement officers in the performance of duties occurring distant from such vehicles.

d.   Body cams, whether manufactured by Digital, TASER or any other manufacturer thereof, are products of a type, configuration and capability that they are and may be used by any law enforcement agency in any part of the United States; they are, in all relevant respects, goods, wares and merchandise sold, commercially, throughout the United States and Digital, TASER and the other manufacturers thereof compete with one another for sale of such goods in each and all of the 50 states and in every place and locality within each of the 50 states ("Relevant Market").

25.   A not insubstantial amount of interstate commerce is and has been affected by TASER's sales of these goods in the Relevant Market.

26.   Like Digital itself, TASER is a "public company", the common stock of which is registered, as a security, with the Securities & Exchange Commission ("SEC") and as provided under, *inter alia*, § 13 of the Securities Exchange Act of 1934, 15 U.S.C. § 78m and associated Regulation S-X, 17 CFR 210.1-01, *et seq*., TASER is required to file annual financial reports with the SEC on SEC "Form 10K".

27.   According to its annual 10K filing for the year ending 12/31/14, TASER's business operations are comprised of two "reportable segments":

a.   The sale of CEW's together with associated accessories, replenishable components and services; and

b.   The sale of its "AXON®-branded body cam and other camera systems", together with the cloud-based evidence management systems/data warehouse known as "Evidence.com®" to which the sale of these "camera systems" is effectively tied.

28.     In Note 15 to TASER's consolidated financial statements for the year ending

12/31/14 as it appears in such form 10K filing, TASER's auditors make each of the following

findings, all of which TASER has itself certified to be true, under penalty of law:

      a.     In 2014, TASER recorded total net sales in its "weapons segment" of $145,613,000;

      b.     After the deduction of Cost of Goods Sold ("COGS"), sales, general and administrative expenses ("SG&A") and Research and Development ("R&D"), TASER realized total income from its weapons segment in the amount of $51,072,000;

      c.     In its AXON/body cam segment, TASER recorded total product sales in the amount of $14,700,000, a near doubling of product sales revenues over 2013 when TASER recorded product sales of $8,649,000;

      d.     TASER recorded service revenue in its AXON segment of $4,212,000 more than doubling the $1,708.00 in service revenue which it received in 2013;

      e.     Accordingly, TASER realized total revenues in its AXON/body cam segment of $18,912.00.

29.     TASER has actual, insipient or potential power in and over the Relevant Market

for the reason that, *inter alia*, as TASER has itself declared on its own website:

      a.     16 "large" cities in the United States have purchased body cams from TASER rather than from any other manufacturer or seller; and

      b.     Fully "95% of major law enforcement agencies" in the United States that "have chosen to employ body cams/body-worn cameras have elected to purchase" them from TASER rather than from any other manufacturer/ seller.

**D.     Reports by News Agencies Regarding TASER's Bribery of Police Officers and Public Officials Throughout the United States**

30.     On February 15, 2015, *USA Today*, a daily newspaper of general circulation,

distributed throughout the United States, published a news article/report, whether by electronic

means or otherwise, wherein it declared that in "**the race to equip police officers with body**

cameras, **some cities are bypassing traditional purchasing rules to award vendors with controversial no-bid contracts**".

 31. According *USA Today's* 2/15/15 story:

  a. "**Hundreds of cameras and millions in public dollars have been committed in such deals involving Albuquerque [N.M], San Diego [Calif.] and Spokane [Wash.]**", *Id.*;

  b. In Los Angeles, the City Police Department used "**[a]bout $1.6 million in private funding**" to purchase body cameras from TASER "**which [was] not subject to regular municipal controls**";

  c. In San Diego, "**the city approved a nearly $1 million sole-source contract with TASER … because it offered a potential 'solution' to a public safety problem**";

  d. After "**a field trial of the TASER cameras**" and only on TASER's cameras, "**the city's purchasing officials recommended**" that TASER devices and TASER devices only be purchased by the city of San Diego allegedly "**because of 'unique functions …' that were 'deemed a necessity'**".

 32. Thereafter, on March 3, 2015, the *Associated Press*, one of the largest newsgathering organizations in the world, published a news article/report describing the "financial ties" which TASER had "cultivated" with police chiefs whose departments had purchased its body cams.  According to the 3/3/15 report:

  a. TASER which was "**emerging as a leading supplier of police body cameras has cultivated financial ties to police chiefs whose departments have bought the recording devices, raising conflict-of-interest questions**";

  b. TASER "**is covering airfare and hotels for police chiefs who speak at promotional conferences and is hiring recently retired chiefs as consultants, sometimes months after their cities sign contracts with the company**".

 33. Three days later on March 6, 2015, the *Associated Press* published a further news article/report wherein it stated that:

a.   "**[t]wo big cities are reviewing their ethics policies after the Associated Press reported on how their police chiefs were closely linked to**" TASER;

b.   These "**reviews [came] after the *AP* reported that TASER was building financial ties to current and former police chiefs who promote the company's body cameras and video storage system**";

c.   "**Salt Lake City Mayor Ralph Becker directed staff to review whether the rules and relationships with city vendors should be updated after facing questions about Chief Chris Burbank's speeches at TASER-sponsored events and online promotional video**", *Id.*;

d.   A Salt Lake City councilman said "**he was surprised when he learned last year that the city's police department had purchased TASER cameras using surplus money, bypassing the standard bidding process and City Council approval**".   Although the Salt Lake City Police Department "**declined to say how much it … spent acquiring 295 body cameras**" from TASER;

e.   Like Salt Lake City, the City of Ft. Worth, Texas was "**reviewing whether its code should be strengthened to address perception problems, including vendor-funded travel and product endorsements**";

f.   Public records in Ft. Worth "**show[ed] that Ft. Worth's then-police chief Jeffrey Halstead worked last year to complete a contract worth $2.7 million for 400**" TASER body cameras and cloud storage "**before a TASER "quarterly [sales] deadline**";

g.   Police Chief Halstead "**later accepted TASER-funded trips to Boston, Miami and Phoenix**" and after retiring from the Ft. Worth Police Department "**in January, said he planned to become an 'official consultant' before traveling to Australia and Abu Dhabi for TASER events**", *Id.*

34.   According to the *Associated Press* articles/reports of 3/3 and 3/6/15:

a.   The "**decision by Memorial Villages, Texas Police Chief J.D. Sanders**", another Texas police chief, "**to allow his newly hired assistant Ray Schultz to work on the side as a TASER consultant**" also "'**runs counter to the**'" ethics code adopted by the Texas Police Chiefs Association, at least according to the Chairman of its Ethics Committee, Tom Cowan;

b.   Ray Schultz "**is the former chief of police in Albuquerque where the Inspector General and Internal Auditor are reviewing a $1.95 million**

       **no-bid contract**" which Schultz "**backed for TASER body cameras in 2013 before stepping down**";

c.     In "documents supporting a $788,000 no-bid 2014 contract with TASER", Spokane, Washington "officials also cited unique product functions and a 'package deal' that would save the city $488,000";

d.     In Ft. Worth, "**e-mails obtained by the AP under … open records law show that then-Police Chief Jeffrey Halstead was seeking 400 more body cameras for officers**" in 2014 "**and that TASER promised a discount if the deal could be approved before the end of the company's sales quarter**" (AP, 3/3/15);

e.     "**Over the next three weeks, Halstead successfully pushed the city to approve a no-bid contract worth up to $2.7 million**", Halstead "**kept TASER representatives aware of his progress**" and Halstead added "**at one point that he deserved a raise**" because he succeeded in getting the contract approved before the end of TASER's "**sales quarter**";

f.     In "**the following months, TASER had Halstead speak at events in Phoenix, Miami and Boston covering his airfare and lodging**" and the "**four-day Boston trip for Halstead and a companion**" alone "**cost TASER $2,445**";

g.     Halstead "**said he reached an oral agreement during the contract negotiations to travel to three other cities at Ft. Worth's expense to talk about his experience with TASER cameras**" and in "**one e-mail, he told a TASER representative he believed he could persuade San Antonio to buy its cameras 'but my fee is not cheap! LOL'**";

h.     In New Orleans, former "**police Superintendent Ronald Serpas confirmed he signed a TASER consulting agreement after he stepped down**" from the New Orleans Police Department "**in August of 2013**"; that Serpas had "**spoken at [TASER]-sponsored events in Canada and Arizona**" and that "**less than a year earlier, in December, 2013**", New Orleans "**agreed to a $1.4 million contract with TASER for 420 cameras and storage**":

       i.     In "**an interview with the *AP*, Serpas declined to detail how the consulting deal came about but said it did not violate a state ethics law because he is not lobbying his former employer**" and also said that he "**was not on the committee that recommended TASER for the contract**";

       ii.    Although Serpas said that his "role was to speak about how technology affects policing and not to promote products", TASER's own marketing materials "**quote him as calling**"

TASER's body "**cameras … 'a game changer for police departments here and around the world**'".

**E.    Findings of the New Mexico State Auditor Regarding the Albuquerque Police Department's No-Bid Purchase of Taser Body Cams**

35.    As indicated by the *Associated Press* in its news articles/reports of March 3 and March 6, 2015, the purchase of TASER body cams by the City of Albuquerque was the subject of two formal audits, one by the State of New Mexico, Office of the State Auditor and a second by the City of Albuquerque's own Office of Internal Audit.   Both such reports have been published and released and are available for public inspection.

36.    According to the audit performed by the New Mexico State Auditor:

a.    The "**former employment with the city of former Police Chief Raymond Schultz … (ending with his retirement date of January 1, 2014) overlapped with his contract work with TASER … (beginning in October, 2013), resulting in the probable violation of City Conflict of Interest and Public Purchase ordinances and the Governmental Conduct Act**" of the State of New Mexico;

b.    There was "**a close correlation between the Albuquerque Police Department dealings with TASER and as evidence of TASER's influence over the procurement process of which**" former Chief Schultz "**boasted [of the] personal benefits the Chief and other [police department] employees received from TASER**" thus indicating "**additional violations of the City's Conflict of Interest and Public Purchase ordinances and the Governmental Conduct Act**";

c.    There were weaknesses "**in the procurement process**" which "**cast further doubt on the legitimacy of the TASER procurement**" which weaknesses included "**a vulnerability to non-competitive procurement … based on**" supposed exemptions "**and a lack of documentation of testing to support TASER's no-bid contract**".

37.    On 4/30/15, the *Associated Press* published a further article/report wherein it commented upon the New Mexico Auditor's findings.  In that report, the *Associated Press* noted the following:

a. A spokesman for Albuquerque's mayor said "**the city has halted monthly contract payments to TASER for the last seven months as it conducts a comprehensive review of the contract**";

b. According to the Mayor's spokesman, the city's "**internal controls failed under**" former Chief Schultz "**and the city made changes 'to ensure that type of circumvention of the process does not occur again'**";

c. Although TASER had "**become a leader in the fast growing market for cameras that officers wear on their uniforms … its relationships with police officers have raised ethics questions**";

d. According to the New Mexico State Auditor Tim Keller, former Albuquerque Chief Schultz had "**committed 'substantial violations' of city and state ethics laws in its dealings with TASER and prosecutors should determine whether to bring criminal charges**";

e. According to State Auditor Keller, a "**yearlong review of the city's handling of the $1.95 million [TASER] contract found 'rampant disregard for all of those things that protect our taxpayer dollars'**".

38. On 4/30/15, KRQE Television News 13, a broadcast news organization within the Albuquerque, New Mexico metropolitan area, published its own online news article/report commenting on the State Auditor's findings and Auditor Keller's comments at a news conference at which the audit was released. The KRQE report says the following:

a. Auditor Keller was quoted as being of the belief that former Albuquerque Police Chief "**Schultz committed crimes**";

b. The New Mexico State Auditor's office "**basically believe[d] that these violations occurred; we believe the law was broken**";

c. The Auditor's office could not "**say definitively … because we need to hear from**" former Chief Schultz and that since Schultz had decided that he was "**not going to talk to folks about that, the matter has to go to court … . [T]hat's where the legal system will compel him to have this discussion with the citizens of New Mexico about whether the law was broken**";

d. Auditor Keller "**pointed to TASER-paid junkets for Schultz and others, the former Chief's ignoring of a one-year post-retirement prohibition on city employees going to work for city vendors and**" what the auditor found to be the police department's "**'intentional attempt to subvert a procurement process'**";

16

e.  According to Auditor Keller, this was "**evidence that [TASER] … was given an unfair advantage and the inside track to a seven-figure contract**";

f.  According to Auditor Keller, "**[w]e think there's some clear evidence that these laws may have been violated and that's why we're referring this matter to the appropriate law enforcement agencies for prosecution**";

g.  The State Auditor's review had "**followed a series of [KRQE] News 13 reports that first showed Schultz had gone to work with TASER weeks after the city signed [the] lucrative contract with the company for body cameras and cloud-based video storage**" and that Schultz had "**been in talks with the company for months about a job before his retirement**";

h.  In "**one e-mail obtained by News 13 [pursuant] to a public records request**", former Chief "**Schultz assured a TASER representative that the body camera contract had been 'greased' and would sail through a City Council committee**";

i.  Schultz "**sent that e-mail while he was still at the helm of**" the police department and "**also boasted in a separate e-mail to TASER staffers that even after his retirement, he would still have the mayor of [Albuquerque], Mayor Richard Berry and Chief Administrative Officer Rob Perry**" in his pocket;

j.  In his report and subsequent interview, Auditor Keller "**cited those e-mails as highly suggestive that Schultz had exerted improper influence on the contract process – and as warning signs of illegal conduct**";

k.  Keller's report came "**as scrutiny of TASER's relationships with police executives across the country is increasing**";

l.  In a press release issued in response to the State Auditor's findings, TASER defended its "**relationship with**" the Albuquerque Police Department and the "**practices leading up to the deal**" and stated that it was and remained TASER's "**belief that we were fully compliant with all ethics guidelines**";

m.  "**Nonetheless, [TASER] announced a big change: it's implementing a one-year 'cool-off' period before paying former law enforcement officials for consulting engagements**", a rule, which according to TASER, would "'**eliminate any perception of a conflict of interest … while continuing to act with integrity and transparency in all our business dealings**'".

39.     On May 1, 2015, the *Associated Press* published a further news article/press report declaring that the ex-Albuquerque Chief Police "**allegedly took bribes from TASER during bid for body cameras**".  According to the report:

a.      The New Mexico State Auditor Keller had "**forwarded his findings to prosecutors who will decide if**" former Albuquerque Police Chief "**Ray Schultz broke the law in his dealings with TASER**";

b.      Auditor Keller said "**Schultz gave TASER an unfair advantage for the 2013 contract in the final days of his tenure, even sending a TASER salesman an e-mail saying the process was 'greased'**";

c.      The "**same day, the two discussed his [Schultz's] prospective employment as a consultant, which would later take him to Amsterdam, Australia and elsewhere to speak about technology on [TASER's] dime**";

d.      A spokesman for the Albuquerque City Mayor "**said the city has halted monthly contract payments to TASER for the last seven months as it conducts a comprehensive review of the contract**";

e.      TASER's "**relationships with police officials have raised ethics questions**" since TASER "**has covered airfare, hotels and meals for chiefs and associates who attended training and networking events and hired Schultz and two other chiefs as consultants within weeks or months after they retired**".

## F.  Findings of the City of Albuquerque's Office of Internal Audit Regarding the Albuquerque Police Department's No-Bid Purchase of Taser Body Cams

40.     The City of Albuquerque's Audit Report from its own Office of Internal Audit was issued on 5/5/15, less than a week after the New Mexico State Auditor's report, and contains all of the following findings:

a.      The Albuquerque Police Department's purchase of "**75 [TASER] body-worn cameras and Evidence.com data storage services ... did not comply with the City of Albuquerque's ... competitive procurement process**";

b.      Police department personnel "**bypassed purchasing regulations and approvals and compromised the integrity of the procurement process**";

    c.    Department officers "**neglected the responsibilities as government employees to determine the Department's specific needs and then initiate a competitive procurement process to get the best product at the lowest price**";

    d.    This initial "**pilot purchase was then used as a basis for justifying the non-competitive purchase of Evidence.com and associated products on 9/30/13**" totaling $1.9 million, *Id.*;

    e.    The City of Albuquerque "**signed TASER's standard services contract with a few modifications**" notwithstanding that the contract did not contain five (5) legally-"**mandated clauses that limit risk to the city and allow independent contract oversight …**";

    f.    The department's former Chief Ray Schultz "**entered into a contractual relationship with TASER in October, 2013**" while "**still technically employed by the city**" and "**continued to serve as a contractor after his official retirement date of December 31, 2013**";

    g.    City "**employees are prohibited from representing businesses in connection with matters in which they performed official acts for one year after retirement**" and the former chief's "**contract with TASER may have violated [that] Ordinance**";

    h.    In "**addition, other**" police "**personnel accepted meals, travel and lodging from TASER**" and "**also solicited sponsorship donations from TASER**" notwithstanding that the "**acceptance of meals and other gratuities and the solicitation of funds from vendors are not consistent with city conflict of interest regulations**";

    i.    Indeed, when "**police personnel accepted gratuities from TASER, they violated multiple city regulations**", *Id.* at p. 20;

    j.    Finally, according to the City Auditor's report, TASER had overcharged the City of Albuquerque for what were determined to be overlapping Evidence.com services and should refund $25,243 to the city.

41.    On 5/5/15, KRQE News 13, a broadcast television station which serves the Albuquerque, New Mexico market, published an online news article/report wherein it commented upon the City Auditor's findings.  According to that report:

    a.    Much "**of the [city auditor's] report repeated the findings of [New Mexico State Auditor] Keller's audit: city employees bypassed the bid process by adding an initial $100,000, 75-camera purchase to an existing no-bid TASER contract, which was intended for TASER**

weapons" and employees "**then used the first purchase to justify not putting the full 525-camera contract out to bid**";

b.  Police department "**personnel insisted the department tested cameras from other brands**", i.e. cameras made by someone other than TASER but nonetheless failed to "**provide the purchasing department with any documentation about [that] testing**";

c.  According to "**information provided to auditors by TASER's Chief Operating Officer**", former Police Chief "**Schultz is paid $1,000 per day as a consultant for TASER, plus airfare, meals and hotels**";

d.  Chief Schultz "**made presentations for TASER in Philadelphia and the U.K. while still on**" the police department's "**payroll**".  Since then, Schultz had "**made a dozen presentations**" for TASER "**from Mexico City to Amsterdam and continue[d] to work as a consultant for the company**";

e.  The "**initial contract for 75 body cameras were signed by**" a police department "**lieutenant who didn't have authority to approve the purchase**";

f.  According to the report, two police department employees identified as the department's "**Fiscal Manager**" and "**Senior Buyer**" knew that they "**were trying to get around the rules**".  In one e-mail, "**one of the [department] employees details a city 'loophole' in which products purchased as part of an existing contract can sneak past a city committee that double checks technology purchases**".

42.  On September 8, 2015, KRQE 13 in Albuquerque updated its initial news article/report of April 30, 2015 regarding the purchase of TASER body cams.

43.  According to this updated news article/report:

a.  New Mexico State Auditor Keller had cited e-mails from former Police Chief Schultz to TASER "**as highly suggestive that Schultz had exerted improper influence on the contract process – and as warning signs of illegal conduct**";

b.  Should prosecutors move "**forward with the case,  Schultz could face prison time and tens of thousands of dollars in fines**";

c.  Auditor Keller's report came "**as scrutiny of TASER's relationship with police executives across the country is increasing**";

d.     When "**KRQE News 13 first reported on the details of the relationship between Schultz and TASER, the City defended the contract and the process used to secure it**";

e.     For "**a year, the City … maintained that**" the Albuquerque Police Department "**tested body camera systems from other companies**";

f.     Auditor Keller "**said in his report**", however, "**that auditors found little if any evidence to support that claim**";

g.     As "**of April, 2014, the City had spent nearly $1.5 million on its rolling, no-cap sold as source contract for 'TASER equipment, supplies and repairs' that was signed in March, 2011**";

h.     In "**October, 2013, the City spent an additional $345,725 for the first of a separate, five-year camera contract**";

i.     Now, however, "**the payments**" had "**stopped**" and "**as of early Thursday**" [September 3, 2015], "**TASER no longer comes up in vendor searches**" of the  City of Albuquerque's website "**not even for records of past payments**".

**G.     The Purchase of Taser Body Cam's by the Los Angeles, California Police Department Through a Private "Police Foundation", Without Compliance With the City's Procurement Regulations and After Taser Had "Donated" More Than $84,000 to Such "Foundation"**

44.     On December 22 and 23, 2014, the *Los Angeles Daily News*, a daily newspaper of general circulation in the Los Angeles, California area published news articles/reports regarding the Los Angeles Police Department's acquisition of some 860 body cams from TASER through a "Police Foundation" and otherwise without competitive bidding, as a means of avoiding "bureaucratic red tape".

45.     According to this news article/report:

a.     The President of the Los Angeles Police Commission "**turned to rich friends like Jeffrey Katzenberg, CEO of Dreamworks … to raise $1 million for the first body cameras for the LAPD**";

b.     The plan was to "**buy the equipment through the Los Angeles Police Foundation, a private non-profit organization that doesn't have to follow city purchasing rules**";

21

    c.          The President's goal was "**quickly exceeded**" and as he was "**preparing … to announce a contract for 860 body cameras**", the LA Mayor declared that he "**wanted body cameras for 7,000 officers …**";

    d.          On "**top of the private funds**", the City Mayor "**pledged nearly $10 million of taxpayer money**";

    e.          "**[h]igh-ranking police department officials had selected cameras made by TASER International**", exclusively "**as the subject of this massive purchase**";

    f.          Other officials in Los Angeles were "**now asking if the City should open the contract for competitive bidding**" since TASER had "**donated more than $84,000 to the Police Foundation and [to] the Department [over] the past three years**";

    g.          There was a "**question**" whether "**the City is playing favorites**";

    h.          Although the LAPD claimed to have "**field-tested**" competing "**camera models**", it "**didn't negotiate pricing**" until it "**had already selected … TASER …**";

    i.          Los Angeles "**Councilman … Parks, the former Police Chief who started the foundation in 1998**", commented that "**you have to use safeguards to make sure the money is being spent properly and no one is getting an unfair advantage**";

    j.          The "**LAPD and other departments have been criticized for using foundations to circumvent the public process, especially when they acquired controversial surveillance technology**";

    k.          TASER "**donated 80 stun guns to the LAPD through the LAPD foundation in 2012 and 2013 … [v]alued at nearly $82,000**";

    l.          Another Los Angeles "**Police Commissioner**" expressed "**concern[ed] about the appearance of a conflict of interest**";

    m.         The "**first batch of 860 cameras [would] soon come to the City Council for acceptance**" but the question of the remaining 6,140 cameras is uncertain;

    n.          Neither the LAPD nor the "**Mayor's Office would say if they would open the contract to bidding**";

    o.          These body cams were "**really just a way in the door for TASER which is betting on long-term data storage revenue**". According to the President of the Police Commission, "**TASER will charge $50 per**

month" per body cam "**for storage ... an ongoing annual cost of $4.2 million if the LAPD buys all 7,000 cameras**";

p.    The Commission President said "**he avoided the open bidding process because of the risk of long delays**" associated with the "**bureaucratic process**";

q.    Current "**councilman and former**" LAPD Chief Parks commented that these rules are "**only called bureaucratic when they don't go fast enough**" and added that "**when someone does something illegal, it's called corruption ... .  There has to be a balance**".

## H.    Taser Makes Thousands of Dollars in Contributions to the Election Campaign of a Los Angeles City Councilman Responsible, Together With Other Members of the City Council, For Approving the Sale by Taser to the City of Los Angeles of 6,140 Body Cams

46.    Subsequent to the publication of the news articles/reports identified in ¶¶ 44-45 hereinabove, the *Los Angeles Times*, another daily newspaper of general circulation in the Los Angeles, California area, published its own news articles/reports regarding the purchase, by the City of Los Angeles directly, of fully 6,140 body cams manufactured by TASER.

47.    According to these news articles/reports:

a.    "**Critics [had] decr[ied] contributions to [Los Angeles City] Councilman Englander from TASER execs seeking LAPD camera contract**";

b.    LA City "councilman Mitch Englander ... accepted campaign contributions from TASER International executives" when that firm was and "is seeking an LAPD camera contract";

c.    That, despite the fact that LA "voters went to the polls in 2011 to crack down on what some referred to as 'pay-to-play' practices at City Hall, passing a measure to limit the political influence of companies that seek government business";

d.    However, "that law may prove to be toothless in the case of TASER International, the Scottsdale, Ariz. company currently up for a $31.2-million contract to provide thousands of body cameras to the Los Angeles Police Department";

e.    "**Last year, a dozen donors affiliated with TASER, half of them company executives, put $8,400 into the re-election bid of Councilman Mitch Englander**" who "**heads the Council's Public Safety**

Committee" that "**recently reviewed the effort to buy 6,140 cameras**" from TASER;

f.   An Englander spokesman said that "TASER was not subject to" the recently-enacted "pay-to-play" measure "because they were not bidding on a contract or responding to any solicitation by the city" at "the time the money was given";

g.   "Critics contend TASER was already in the process of seeking work from the city when the donations were made since Englander … accepted the contributions in June, 2014, when TASER and a competitor were already several months into a field test of their body camera equipment at the LAPD";

h.   This "testing period helped lead to the Department's decision to recommend TASER as its body camera vendor";

i.   Nevertheless, "under the city contracting rules, that test was not considered a formal bid process";

j.   The "executive director of a California 'campaign finance watchdog group' … said the fact that a competition was under way – one involving TASER – shows that the contributions to Englander violate[d], at minimum, the spirit of" the pay-to-play measure.

I.   **Taser's Sale of $4.5 Million in Body Cams to the City of Memphis and its Agreement, Concomitantly, to Pay the Sum of $880,000 to a "Public Relations" Firm Owned in Part by the Memphis Mayor's "Campaign Manager"**

48.   On September 27 and 28, 2015, WREG News Channel 3, a broadcast television station serving the Memphis, Tennessee metropolitan area, published a news article/report regarding what it described as a "**controversy surrounding a contract**" to promote the "**police body cameras**" which the City of Memphis Police Department had just purchased from TASER. According to these news articles/reports:

a.   By contract dated September 2, the Memphis Police had ordered "**2,000**" body cams "**and video footage storage over five years**" from TASER at a cost of "**$9.4 million**";

b.   Purportedly, Memphis "**asked TASER to conduct a local public awareness campaign about the public safety and accountability benefits of the cameras, even though the contract**" between TASER

and the city for the purchase of these devices did not "**require**" and failed even to mention any such activity;

    c.    TASER then awarded the Memphis Mayor's "**campaign manager**", Ms. Deidre Malone, a contract worth "**$880,000**" to conduct such a "**marketing**" campaign "**for Memphis Police Department body cameras**";

    d.    Reportedly, TASER "**hired**" Ms. Malone's "**firm to get the word out about body cameras**";

    e.    Memphis councilman Harold Collins said "'**it looks sort of strange to me**'" and Memphis councilman Jim Strickland said that he did not "**think that's the right way to do things**";

    f.    According to the Mayor's campaign manager, when she "**received the contract**" from TASER, it "**already**" had been "**hired by the City of Memphis**" to sell body cams to it.  "**So there's nothing fishy about a minority-owned, woman-owned business obtaining a contract with the city**";

    g.    The Memphis Mayor "**said he was unaware his campaign manager was awarded an $880,000 contract to do marketing for the Memphis Police Department body cameras**";

    h.    The Mayor insisted that he "**knew nothing of the contract until reporters began asking questions**";

    i.    Nevertheless, TASER's hiring of a firm "**partly owned by a paid campaign manager**" for the Mayor had "**created a political maelstrom for**" him "**ahead of**" a "**fast-approaching … election**";

    j.    Accordingly, on October 1, 2015, the Mayor announced that the "**controversial contract between TASER International and the Carter-Malone Group**" owned by his campaign manager had "**been canceled by 'mutual consent' of both parties**".

## J.    Taser's No-Bid/No-Competition Contract to Sell Body Cams to the City of San Francisco

49.    On June 19, 2015, KQED TV, a broadcast television station serving the San Francisco, California metropolitan area, published a news article/report regarding what it described as "**the story behind the SFPD body cam program [ ]**".

50.    According to that news article/report:

a.  On May 17, 2011, San Francisco Police Chief Greg Suhr announced that the Department intended to launch a "body camera pilot program";

b.  Nevertheless, the SFPD "**didn't actually buy any cameras until December, 2014 … [a]nd the pilot program was never launched**";

c.  "**Instead, on April 30, [San Francisco] Mayor … Lee with Suhr at his side announced that the city would spend more than $6 million to buy body cameras for the entire police department**";

d.  A "**KQED investigation found the department spent nine months obtaining a sole-source waiver allowing it to purchase cameras from TASER International, without considering other bids**";

e.  Further, "**[d]ocuments and interviews with top police officials reveal that the Department requested a no-bid contract after field-testing only TASER cameras**";

f.  The "Department's handling" of the matter raised "questions" about "its relationship with TASER …";

g.  A police commissioner "said she had been contacted by other camera manufacturers asking whether the city would request bids for its next purchase";

h.  That Commission member "**said she didn't know about the no-bid contract with TASER until KQED showed her the sole-source waiver**";

i.  That commission member asked "about the Department's deal with TASER at [a] … Police Commission Meeting" and was told by Chief Suhr that the "'cameras did go out to bid'" and that "'TASER won that bid'";

j.  In truth, however, documents "obtained by KQED show that [Chief] Suhr himself requested and received a waiver from the U.S. Department of Justice which funded the program" and "also signed a similar request to the City's Office of Contract Administration, allowing the Department to purchase contracts from TASER without considering other bids";

k.  The City's "OCA granted that request in September, 2013";

l.  "**San Francisco's last four chiefs of police - … all tried to win approval from the city's Police Commission to equip officers with**" weapons manufactured by TASER "**[b]ut public opposition killed the proposal each time**";

m.  According to a former SF Police Commissioner, TASER had "marketed very aggressively to the SFPD";

n.  San Francisco County Supervisor "Avalos says he was alarmed to find out the police department was pursuing a no-bid contract for body cameras" and said that "issuing a bid request is 'standard practice'" and that it "should be the process followed for this multi-million dollar purchase".

**K.  Taser's Other Contracts, Combinations and/or Conspiracies with Government Procurement Officials, the Purpose and Effect of Which Has Been to Exclude Digital and Other Qualified Sellers of Body Cams, From Competition**

51.  As demonstrated in the paragraphs above, TASER and procurement/purchasing authorities in the cities of Los Angeles, San Diego, Salt Lake City, Ft. Worth, Albuquerque and Spokane and/or agents, representatives or intermediaries acting for or on behalf of such procurement/purchasing authorities have entered into contracts, combinations and/or conspiracies, the intended purpose and effect of which is has been to exclude Digital and others from competition in the sale of body cams to such procurement/purchasing authorities within the Relevant Market, as evidenced by the following, among other things:

a.  TASER has caused or induced such procurement authorities or their agents to purchase its body cams without requests for competing bids, or without adequately publicizing requests for competing bids, without allowing a reasonable time in which competitive bids could be submitted;

b.  TASER has induced such procurement authorities or their agents to treat or deem TASER as the "sole source" of body cams, without any consideration of the competing products offered by Digital and others;

c.  TASER is and has been a "sole source supplier" to the governmental entities represented by such procurement authorities or their agents with respect to other goods or services;

d.  TASER has induced such procurement authorities or their agents to draft specifications for the body cams to be purchased in such a way as that only TASER's products could satisfy such specifications;

e.  TASER has induced such procurement authorities or their agents to purchase its product without compliance with the purchasing rules and regulations, including rules relating to competitive bidding and the testing of competitive products which otherwise governed the use of public funds by such purchasing authorities/agents for the purchase of goods or services;

f.  TASER has induced such procurement authorities or their agents to adopt unreasonable "pre-qualification" requirements or procedures which, in truth and in fact, only TASER could satisfy; or

g.  A significant number of qualified bidders failed to bid or to respond to requests for bids, if any.

52.  On June 5, 2014, Digital contacted the Police Department of the City of Wichita, Kansas within the Relevant Market in order to discuss Digital's product offerings, including its body cams.

53.  Digital was informed by Wichita authorities that they were in possession of a few TASER-manufactured "cameras"; that the city was even then "testing them" under a purported "pilot program"; and that the city was "interested in seeing what" competing products Digital had to offer.

54.  After unsuccessful attempts to arrange an actual meeting between Wichita procurement authorities and Digital personnel, on September 14, 2014, Digital was informed that Wichita officials would in fact meet with Digital's representatives on September 25, 2014.

55.  At such September 25, 2014 meeting and upon inquiry, Digital informed Wichita procurement officials that it would have a so-called "point of view" body cam, affixable to the wearer's head, as well as its usual "chest mount" camera, available for testing and purchase in November, 2014.

56.  On November 11, 2014, Digital was informed by Wichita procurement officials that they intended to "get approval for" Digital's inclusion in the "pilot program", for purposes of testing TASER's competing products against the "point of view" body cams that Digital itself offered for sale.

57.     On November 17, 2014, Digital was informed by Wichita procurement authorities that they needed "more information on" Digital's products, which information was then transmitted to them immediately by electronic mail.

58.     In mid-December, 2014, a Digital representative informed the Chief of the Wichita Police Department, in person, that Digital was very interested in participating in the city's "pilot program" whereby body cams, including those manufactured by TASER and Digital, would be compared against products manufactured by their competitors and in response, the Chief of the Wichita Police Department said that "they would be in touch".

59.     In truth and in fact, the City of Wichita procurement authorities did not thereafter "get in touch" with Digital or its representatives and on March 26, 2015, Digital was informed by Wichita procurement authorities that "they were not going to test any other body cameras" but rather were going to purchase body cameras manufactured by TASER, exclusively, without any comparison with, or competition by, Digital's products or the products of any other seller of body cams.

60.     The City of Wichita then consummated its purchase of body cams manufactured by TASER in derogation of laws, ordinances and regulations designed to effect the open, transparent and competitive procurement of goods and services by public authorities at the lowest price consistent with the public need for such products and services, and without affording Digital or any other qualified suppliers the opportunity to submit bids for the sale of their own competitive products for the reasons that, among other things:

> a.      TASER had caused or induced such procurement authorities or their agents to purchase its body cams without requests for competing bids, or without adequately publicizing requests for competing bids, without allowing a reasonable time in which competitive bids could be submitted;

b.      TASER had induced such procurement authorities or their agents to treat or deem TASER as the "sole source" of body cams, without any consideration of the competing products offered by Digital and others;

c.      TASER had induced such procurement authorities or their agents to designate or treat it as a "sole source supplier" to the governmental entity represented by such procurement authorities or their agents with respect to other goods or services; or

d.      TASER has induced such procurement authorities or their agents to draft specifications for the body cams to be purchased in such a way as that only TASER's products could satisfy such specifications.

61.     By its acts and conduct, TASER has contracted, combined or conspired with procurement officials or their agents in Wichita, Kansas within the Relevant Market to sell its commercial products to the City of Wichita, Kansas without opportunities for competing bids, without competitive testing and with the intended effect and for the purpose of excluding competition, whether by Digital or by other suppliers of body cams.

**COUNT I**
**(INFRINGEMENT OF U.S. PATENT NO. 8,781,292)**

62.     Digital Ally incorporates by reference paragraphs 1 through 61 herein.

63.     This cause of action arises under the patent laws of the United States of America and, in particular, 35 U.S.C. §§ 271 *et seq*.

64.     Digital Ally is the owner by assignment of the '292 Patent, with ownership of all substantial rights therein, including the right to exclude others and to sue and recover damages for the past and future infringement thereof. A true and correct copy of the '292 Patent is attached as Ex. N.

65.     The '292 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '292 Patent was reexamined and found valid and enforceable with over 59 claims issuing from that reexamination. The reexamination certificate is attached as Ex. O.

66.     TASER manufactures, imports, markets, offers to sell, and sells a line of Axon brand cameras intended for use by law enforcement. Included in the Axon product family, the Axon Body 2 is an officer-mounted law enforcement camera equipped with wireless activation functionality through TASER's Axon Signal product. Ex. P, TASER Axon Body 2 Webpage. Similarly, the Axon Flex is an officer-mounted point of view camera that is also compatible with wireless activation through the Axon Signal. Ex. Q, TASER Axon Flex Webpage; Ex. R, 10/22/2014 Press Release (noting "AXON Flex cameras will automatically respond only to agency squad cars and Smart Weapons specifically equipped with AXON Signal technology."). Finally, the Axon Fleet is a vehicle-mounted camera that is also equipped to automatically activate via TASER's Axon Signal technology.  Ex. S, TASER Axon Fleet Webpage.

67.     TASER also manufactures, markets, offers to sell, and/or sells [t]he Signal Performance Power Magazine (SPPM), which is an integral accessory compatible with a number of TASER smart weapons that "automatically turns on Axon cameras when officers activate their [smart weapon]." The SPPM is "[p]owered by Axon Signal technology [and] uses a secure wireless connection to activate all Axon cameras within range." Ex. F, TASER Smart Weapon Accessories Webpage. In addition to activating Axon cameras in the vicinity, TASER's SPPM-equipped smart weapons also function as independent recording devices, recording and storing certain data concerning each event in which the smart weapon was involved. *See, e.g*., Ex. T, TASER X2 CEW User Manual at 47-48 (detailing metadata stored by smart weapon, including date and time of events such as switching off the safety).

68.     TASER has directly infringed and continues to directly infringe at least exemplary Claim 1 of the '292 Patent.  In addition, Digital Ally intends to assert in this action at least claims 8, 12, 18, 20, 21, 26, 28, 32, 36, 38, 39, 42, 47, 48, 50, 51, 54, and 59 (collectively,

the "'292 Patent Asserted Claims").  With reference to exemplary claim 1 of the '292 patent, Taser directly infringed and continues to directly infringe that claim by, among other things, using, offering for sale and/or selling its Signal Performance Power Magazine ("SPPM") in combination with one or more of Axon Flex, Axon Body, and Axon Fleet cameras. With respect to the SPPM in particular, as of July 7, 2015, TASER sold or, at a minimum, offered to sell the Wichita police department AXON cameras complete with Signal technology and the optional SPPM accessory. *See, e.g.,* Ex. D (indicating that Wichita's contract with TASER for body cameras included "free technology upgrades . . . [t]hat could include 'auto on' functions when an officer draws a taser from their holster.").  Specifically, each of the '292 Patent Asserted Claims recites a "recording device manager," "a first recording device," and "a second recording device," wherein the "recording device manager" receives a signal indicating an officer has instructed the "first recording device" to record and, in response, transmits a signal instructing the "second recording device" to begin recording. As described above in Paragraphs 66 and 67, TASER's SPPM-equipped smart weapons function as both a "first recording device" and "recording device manager," instructing one or more TASER Axon cameras (Axon Body 2, Axon Flex, or Axon Fleet) to begin recording after a police officer switches the smart weapon's safety up to the "ARMED" position. TASER is thereby liable for infringement of the '292 Patent pursuant to 35 U.S.C. § 271(a).

69.     Digital Ally expects that Taser's customers have used and will use the Signal Performance Power Magazine in combination with one or more of Axon Flex, Axon Body, and Axon Fleet cameras, and Digital Ally intends to conduct early discovery into the same. When evidence of such customer use is obtained, Digital Ally intends to amend this Complaint to

allege that Taser is also liable for indirect infringement under at least 35 U.S.C. 271(b) and/or (c).

70. Digital Ally has been harmed by this infringement and is entitled to an injunction and compensation in an amount no less than a reasonable royalty as well as its lost profits for TASER's infringement. Digital Ally also will seek a permanent injunction barring TASER from selling its infringing Axon products with Signal technology.

## COUNT II
### (INFRINGEMENT OF U.S. PATENT NO. 9,253,452)

71. Digital Ally incorporates by reference paragraphs 1 through 70 herein.

72. This cause of action arises under the patent laws of the United States of America and, in particular, 35 U.S.C. §§ 271 *et seq*.

73. The '452 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. Digital Ally is the owner by assignment of the '452 Patent, with ownership of all substantial rights therein, including the right to exclude others and to sue and recover damages for the past and future infringement thereof. A true and correct copy of the '452 Patent is attached as Ex. U.

74. TASER manufactures, markets, offers to sell, and sells a line of Axon brand cameras intended for use by law enforcement. Included in the Axon product family, the Axon Body 2 is an officer-mounted law enforcement camera equipped with wireless activation functionality through TASER's Axon Signal product. Ex. P, TASER Axon Body 2 Webpage. Similarly, the Axon Flex is an officer-mounted point of view camera that is also compatible with wireless activation through the Axon Signal. Ex. Q, TASER Axon Flex Webpage; Ex. R, 10/22/2014 Press Release (noting "AXON Flex cameras will automatically respond only to agency squad cars and Smart Weapons specifically equipped with AXON Signal technology.").

Finally, the Axon Fleet is a vehicle-mounted camera that is also equipped to automatically activate via TASER's Axon Signal technology.  Ex. S, TASER Axon Fleet Webpage.

75.     TASER manufactures, markets, offers to sell, and sells [t]he Signal Performance Power Magazine (SPPM), which "automatically turns on Axon cameras when officers activate their [smart weapon]." The SPPM is "[p]owered by Axon Signal technology [and] uses a secure wireless connection to activate all Axon cameras within range." Ex. F, TASER Smart Weapon Accessories Webpage. In addition to activating other cameras in the vicinity, TASER's SPPM-equipped smart weapons function as recording devices, recording and storing metadata concerning each event in which the smart weapon was involved. *See, e.g*., Ex. T, TASER X2 CEW User Manual at 47-48 (detailing metadata stored by smart weapon, including date and time of events such as switching off the safety).

76.     TASER also manufactures, markets, offers to sell, and sells the "Axon Signal, an automatic activation technology for Axon cameras" that "automatically activates your Axon cameras to ensure that vital footage is recorded." Ex. A, TASER Axon Signal Webpage. The "Axon Signal can be tailored to activate cameras based on various triggers from your car (such as light bar, crash, door), from your TASER Smart Weapons, and more." *Id*.

77.     TASER is infringing the '452 Patent under 35 U.S.C. § 271 by performing, without authority, one or more of the following acts: (a) making, using, offering to sell, and selling within the United States Axon Signal or Signal Performance Power Magazine in combination with one or more of Axon Flex, Axon Body, and Axon Fleet cameras that practice the inventions of the '452 Patent; (b) contributing to the infringement of the '452 Patent by others in the United States who use the Axon Signal in combination with at least one Axon Flex or Axon Body camera and any number of additional Axon Flex, Axon Body, or Axon Fleet

cameras, the combination of which has no substantial noninfringing uses; and (c) inducing others to infringe the '452 Patent within the United States who use the Axon Signal in combination with at least one Axon Flex or Axon Body camera and any number of additional Axon Flex, Axon Body, or Axon Fleet cameras.

78.     For example, TASER sells, offer for sale, and/or uses at least Axon Signal in combination with one or more of Axon Flex, Axon Body, and Axon Fleet cameras infringing at least claims 3, 7, 11, 15, 16, and 17 of the '452 Patent. Each of these claims recites a "recording device manager" that receives a "trigger signal" related to a law enforcement vehicle and broadcasts a signal to "a first recording device" mounted on or carried by a law enforcement officer and a "second recording device," instructing each of these devices to begin recording. As described above in Paragraphs 74 and 76, TASER's Axon Signal functions as a "recording device manager," receiving triggers related to law enforcement vehicles (e.g., activating the vehicle's light bar) and instructing a first TASER Axon camera mounted on or carried by a law enforcement officer (Axon Body 2 or Axon Flex) and a second TASER Axon camera (Axon Body 2, Axon Flex, or Axon Fleet) to begin recording in response.  TASER is thereby liable for infringement of the '452 Patent pursuant to 35 U.S.C. § 271(a).

79.     As of the filing of this Second Amended Complaint, TASER is inducing its customers to use the specific combination of products detailed in Paragraph 78 who thereby directly infringe the '452 Patent.  As the filing date of this Second Amended Complaint, TASER knows of the '452 Patent, knows its customers' actions infringe the '452 Patent, and actually intended to cause this direct infringement.  For example, with full knowledge that the combination of its products infringe the '452 Patent, as detailed in Paragraph 78, TASER continues to market its Axon Signal, Axon Body 2, Axon Flex, and Axon Fleet products and

instructs its customers to configure and use these products as described in Paragraph 78. *See, e.g.*, Ex. A, TASER Axon Signal Webpage (noting the "Axon Signal . . . automatically activates your Axon cameras to ensure that vital footage is recorded" and can be "tailored to activate cameras based on various triggers from your car (such as light bar, crash, door), from your TASER Smart Weapons, and more."); Ex. P, TASER Axon Body 2 Webpage (noting the "Axon Signal starts the camera with light bar and other sensor activation"); Ex. R, 10/22/2014 Press Release (noting "AXON Flex cameras will automatically respond only to agency squad cars and Smart Weapons specifically equipped with AXON Signal technology."); Ex. S, TASER Axon Fleet Webpage (noting the "Axon Signal turns the camera on with light bar, TASER devices, and other triggers"); Ex. V, Collection of Brochures Provided to TASER's Potential Customers (listing specifications and features of TASER's products, including Axon Signal compatibility for various Axon cameras).   TASER is thereby liable for infringement of the '452 Patent pursuant to 35 U.S.C. § 271(b).  By instructing and training its end-users or customers on how to use its products in a manner that directly infringes at least Exemplary Claim 3, as detailed in Paragraph 78, TASER specifically intended and intends to induce infringement of the '452 Patent.

80.     As of the filing of this Complaint, TASER sold, offered for sale, and/or imported the combination of products described in Paragraph 78 with knowledge of the '452 Patent and knowledge that these products were especially made or adapted for use in an infringing manner. Additionally, because the sole purpose of the Axon Signal is to automatically activate TASER's Axon cameras in response to specific triggers, which is the precise functionality covered by the '452 Patent, this combination of products has no substantial noninfringing uses.  *See* Ex. A,

TASER Axon Signal Webpage (titled, "Auto-Activation for Axon Cameras"). TASER is thereby liable for infringement of the '452 Patent pursuant to 35 U.S.C. § 271(c).

81.     Additionally, TASER infringes at least claim 1 of the '452 Patent by, among other things, using, offering for sale and/or selling its Signal Performance Power Magazine ("SPPM") in combination with one or more of Axon Flex, Axon Body, and Axon Fleet cameras. With respect to the SPPM, as of July 7, 2015, TASER sold or, at a minimum, offered to sell the Wichita police department AXON cameras with Signal technology and SPPM accessory. *See, e.g.,* Ex. D (indicating that Wichita's contract with TASER for body cameras included "free technology upgrades . . . [t]hat could include 'auto on' functions when an officer draws a taser from their holster."). Specifically, claim 1 of the '452 Patent recites a "recording device manager," "a first recording device," and "a second recording device," wherein the "recording device manager" receives a signal indicating the "first recording device" is recording an event and, in response, transmits a signal instructing the "second recording device" to begin recording. As described above in Paragraphs 74 and 75, TASER's SPPM-equipped smart weapons function as both a "first recording device" and "recording device manager," instructing one or more TASER Axon cameras (Axon Body 2, Axon Flex, or Axon Fleet) to begin recording after a police officer switches the smart weapon's safety up to the "ARMED" position. TASER is thereby liable for infringement of the '452 Patent pursuant to 35 U.S.C. § 271(a).

82.     Digital Ally has been harmed by this infringement and is entitled to compensation in an amount no less than a reasonable royalty as well as its lost profits for TASER's infringement. Digital Ally also will seek a permanent injunction barring TASER from selling its infringing Axon products with Signal technology.

## COUNT III
### (COMMERCIAL BRIBERY IN VIOLATION OF § 1(c) OF THE ROBINSON PATMAN AMENDMENTS TO THE CLAYTON ACT, 15 U.S.C. § 13(c))

83.    Digital Ally incorporates by reference paragraphs 1 through 82 herein.

84.    Through its offer or sale of body cams in all of the states and in each of the places and localities within the Relevant Market including, without limitation, its sale of body cams to law enforcement agencies in Albuquerque, New Mexico; Ft. Worth, Texas; New Orleans, Louisiana; Los Angeles, California; San Francisco, California; Salt Lake City, Utah; and Memphis, Tennessee, TASER engages and at all times has engaged in interstate commerce within the meaning of § 1 of the Clayton Act, 15 U.S.C. § 12(a).

85.    In connection with and in order to consummate the commercial sale of body cams to law enforcement agencies/purchasers in Albuquerque, Ft. Worth, Salt Lake City, Los Angeles, New Orleans and Memphis, each and all of which were acting as commercial participants in the Relevant Market, TASER has paid or granted bribes consisting of compensation or other things of value to such agencies/purchasers or to agents, representatives or intermediaries acting for and on behalf of such agencies/purchasers who were at all times subject to their direct or indirect control, within the meaning of § 1(c) of the Robinson Patman amendments to the Clayton Act, 15 U.S.C. § 13(c).

86.    No valid, legitimate and lawful services were rendered to TASER by such agencies/purchasers or by the agents, representatives or intermediaries thereof to whom TASER paid or granted such compensation or, in the alternative, such valid, legitimate and lawful services which TASER did receive were of far less value than the compensation paid for them.

87.    Digital has been injured in its business and/or property as a result of TASER's grant or payment of compensation or other things of value to such purchasers or to the agents,

representatives or intermediaries of such purchasers and the effect of such payments was or could be substantially to lessen competition in the line of commerce represented by the market for body cams and otherwise to injure, destroy or prevent competition between TASER, Digital and all other sellers of body cams in the Relevant Market for the reasons, *inter alia*, that:

a.   Digital and all other manufacturers of body cams are in direct competition with TASER in the sale of body cams, whether in Albuquerque, Ft. Worth, Salt Lake City, New Orleans, Los Angeles, Memphis or in the Relevant Market, generally;

b.   As a direct and proximate result of the compensation and/or things of value paid or granted by TASER, purchasers of its body cams or to agents, representatives or intermediaries of such purchasers, the purpose and effect of which is and has been to exclude competition by other manufacturers of body cams within the Relevant Market, there has been actual injury to competition and Digital itself has suffered the loss of sales, opportunities, revenues and rights to fair and open competition to which, otherwise, it would have been entitled;

c.   By paying or granting such compensation or things of value to such purchasers or to their agents, representatives or intermediaries, TASER intended to deprive Digital and all other competitors of the sales, opportunities, revenues and rights to fair and open competition to which, otherwise, it or they would have been entitled;

d.   Depriving Digital a direct competitor as well as all other competitors similarly situated of sales, opportunities and/or revenues to which, absent violation of 15 U.S.C. § 13(c), they would have been entitled, is an injury of the type for which the anti-trust laws were intended to provide redress;

e.   Although all competitors of TASER who participate or have participated in those markets have likewise suffered injury, none has suffered injury that is more direct and proximate than the injury suffered by Digital; and

f.   There is no potential for duplicative recovery or any complex apportionment of damages by or among competitors of TASER.

88.   Digital's injuries and the injuries to its business and/or property necessarily exceed the sum of $75,000, exclusive of interest and costs.

## COUNT IV
## (COMMERCIAL BRIBERY AND OTHER CONTRACTS, COMBINATIONS AND CONSPIRACIES PROHIBITED UNDER § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1)

89.     Digital Ally incorporates by reference paragraphs 1 through 88 herein.

90.     By inducing and procuring the commercial sale of its body cams to law enforcement agencies in Albuquerque, Ft. Worth, Salt Lake City, Los Angeles, New Orleans, Memphis and Spokane, all of which were commercial participants in the Relevant Market, through the grant and payment of bribes, compensation or other things of value to such purchasers, or to agents, representatives or intermediaries acting for and on behalf of such purchasers, TASER and such purchasers and/or their agents have conspired to make and have otherwise made and entered into contracts, combinations and/or conspiracies, the effect of which is unreasonably to restrain trade, in commerce.

91.     By inducing and procuring the commercial sale of its body cams to law enforcement agencies in Albuquerque, Ft. Worth, Salt Lake City, Los Angeles, San Francisco, New Orleans, Memphis and Wichita, all of which were commercial participants in the Relevant Market, as a sole source supplier; free of any meaningful competition; without a request for or material consideration of competing bids from other qualified suppliers of competing products, and otherwise in derogation of laws, rules and regulations established and in force in such jurisdictions for the impartial, transparent and competitive purchase of goods and services, TASER and such purchasers and/or their agents have conspired to make and have otherwise made and entered into contracts, combinations and/or conspiracies, the effect of which is unreasonably to restrain trade, in commerce.

92.     TASER actually possesses or there is a dangerous likelihood that it will possess market power within the Relevant Market and has otherwise engaged in anti-competitive

conduct, the actual effect of which is and has been to create, retain or enlarge such market power, including, *inter alia*, the power to raise prices above competitive levels and to exclude competitors and competition, in fact.

93.    Digital has been injured in its business and/or property, whether as a result of TASER's grant or payment of compensation or other things of value to such purchasers or to the agents, representatives or intermediaries of such purchasers, or as a result of its contracts, combinations or conspiracies with purchasers or their agents, the purpose of which has been to exclude Digital and other qualified sellers of competing products, and the direct and proximate effect of such payments and/or the exclusion of such qualified competitors has been substantially to lessen competition in the market of/for body cams and otherwise to injure, destroy or prevent competition between TASER, Digital and all other sellers of body cams within the Relevant Market for the reasons, *inter alia*, that:

     a.    Digital and other  manufacturers or body cams are in direct competition with TASER in the sale of body cams, whether in Albuquerque, Ft. Worth, Salt Lake City, New Orleans, Los Angeles, San Francisco, Memphis, Spokane and Wichita or in the Relevant Market, generally;

     b.    Whether as a direct and proximate result of the compensation and/or things of value paid or granted by TASER to purchasers of its body cams or to agents, representatives or intermediaries of such purchasers or of its inducement of such purchasers or agents to exclude Digital and other qualified suppliers from competition, there has been actual injury to competition within the Relevant Market and Digital itself has suffered the loss of sales, opportunities, revenues and rights to fair and open competition to which, otherwise, it would have been entitled;

     c.    By paying or granting such compensation or things of value to such agents, representatives or intermediaries of these purchasers and by otherwise causing or inducing them to exclude Digital and others from competition, TASER intended to deprive Digital and all other competitors of the sales, opportunities, revenues and rights to fair and open competition to which, otherwise, it or they would have been entitled;

     d.    Depriving Digital a direct competitor as well as all other competitors similarly situated, of sales, opportunities and/or revenues to which, absent

violation of 15 U.S.C. § 1, they would have been entitled, is an injury of the type for which the anti-trust laws were intended to provide redress;

e.       Although all competitors of TASER who participate or have participated in those markets have likewise suffered injury, none has suffered injury that is more direct and proximate than the injury suffered by Digital; and

f.       There is no potential for duplicative recovery or any complex apportionment of damages by or among competitors of TASER.

## COUNT V
## (UNFAIR TRADE PRACTICES IN VIOLATION OF
## CAL. BUS. & PROF. CODE § 17043 AND COMMON LAW)

94.       Digital Ally restates and incorporates herein the allegations contained in paragraphs 1 through 93 above.

95.       While engaged in business within the state of California, TASER committed the unlawful and unfair acts or practices in violation of Cal. Bus. & Prof. Code § 17043 that are identified in, *inter alia*, ¶¶ 1, 44-47 and 49-50.

96.       Such acts were committed by TASER for the purpose and with the effect of injuring competitors and destroying competition.

97.       As provided under Cal. Bus. & Prof. Code § 17070, Digital Ally as well as competition in the Market have been injured by such unlawful and unfair acts or practices and Digital Ally has suffered loss and damage of the kind which the prohibitions against restraints of trade, in the state of California and elsewhere, were intended to prevent.

98.       Digital's injuries and the injuries to its business and/or property necessarily exceed the sum of $75,000, exclusive of interest and costs.

## COUNT VI
## (UNLAWFUL, UNFAIR FRAUDULENT BUSINESS ACTS OR PRACTICES AND/OR UNFAIR, DECEPTIVE OR MISLEADING ADVERTISING IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200-17208)

99.     Digital Ally incorporates by reference the allegations contained in paragraphs 1 through 98 of the Complaint.

100.    Within the meaning of Cal. Bus. & Prof. Code § 17200, TASER has engaged in and committed unlawful, unfair, fraudulent business acts or practices as complained of above.

101.    By its acts and conduct, as described in, *inter alia*, ¶¶ 1, 44-47 and 49-50 hereinabove, TASER has done each and all of the following:

a.      TASER has engaged in anti-competitive and unlawful conduct in violation of 15 U.S.C. § 1;

b.      TASER has engaged in anti-competitive and unlawful conduct in violation of 15 U.S.C. § 13(c);

c.      TASER has engaged in unfair, fraudulent, deceptive and unlawful conduct in violation of 15 U.S.C. § 45;

d.      TASER has engaged in unfair and unlawful conduct in violation of Cal. Bus. & Prof. Code § 17043 and common law;

e.      TASER has engaged in anti-competitive and unlawful conduct in violation of Kan. Stat. Ann. §§ 50-101 and 50-161 and common law;

f.      TASER has engaged in anti-competitive and unlawful conduct in violation of Kan. Stat. Ann. §§ 50-112 and 50-161 and common law;

g.      TASER has committed one or more acts of unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200;

h.      TASER has engaged in acts and practices that either have deceived or are likely to deceive members of the public within the meaning of Cal. Bus. & Prof. Code § 17200;

i.      TASER has engaged in unfair, fraudulent, deceptive and unlawful conduct in violation of Cal. Civ. Code §§ 1572, 1709 and 1710.

102.     Digital brings this claim for relief against TASER on behalf of itself and in the common or general interest, and has suffered injury in fact through the actual and continuing invasion by TASER of Digital's legally protected rights and interests, for the reasons that:

      a.      Digital has expended money as a direct and proximate result of TASER's unlawful, unfair and/or fraudulent acts or practices;

      b.      Digital has lost money or property as a direct and proximate result of TASER's unlawful, unfair and/or fraudulent acts or practices; and/or

      c.      Digital has been denied money to which it had or has a cognizable claim as a direct and proximate result of TASER's unlawful, unfair and/or fraudulent acts or practices.

103.     Digital, on behalf of itself and in and on behalf of the common or general interest, seeks a judgment of the Court awarding restitution and disgorgement in an amount to be determined by the Court but necessarily exceeding the sum of $75,000, exclusive of interest and costs, together with injunctive and such other relief as may be necessary or appropriate under Cal. Bus. & Prof. Code § 17200 including Digital's attorneys' fees, costs and expenses.

**COUNT VII**
**(UNLAWFUL COMBINATION/AGREEMENT TO PREVENT COMPETITION IN THE MANUFACTURE/SALE OF MERCHANDISE AND/OR TO RESTRICT TRADE, COMMERCE OR BUSINESS, IN VIOLATION OF KAN. STAT. ANN. §§ 50-101 AND 50-161 AND COMMON LAW)**

104.     Digital Ally restates and incorporates the allegations contained in paragraphs 1 through 103 of the Complaint.

105.     As a result of the acts and conduct described hereinabove, and in violation of Kan. Stat. Ann. § 50-101 and common law, TASER and the individuals and entities mentioned above, together with and/or in concert with other, unknown persons, have formed, initiated and entered into a combination of capital and skill, and in furtherance of such combination have committed acts, which have as their purpose:

a.    The creation or implementation of restrictions in trade or commerce, in Kansas;

b.    The creation or implementation of restrictions in the full and free pursuit of business authorized or permitted by the laws of Kansas; and

c.    The prevention of competition in the manufacture, making, sale or purchase of merchandise in Kansas ("Market").

106.    Such acts were committed or performed by TASER and the persons and entities mentioned above, for the purpose and with the effect of injuring competitors and destroying competition.

107.    As provided under Kan. Stat. Ann. § 50-161, Digital Ally, as well as competition in the Market, have been injured by such unlawful combination and Digital Ally has suffered loss and damage of the kind which these prohibitions against the restraint of trade, in Kansas and elsewhere, are intended to prevent.

108.    Digital's injuries and the injuries to its business and/or property necessarily exceed the sum of $75,000, exclusive of interest and costs.

## COUNT VIII
### (UNLAWFUL CONTRACT COMBINATION OR AGREEMENT TO PREVENT COMPETITION IN THE IMPORT AND SALE OF MERCHANDISE, IN VIOLATION OF KAN. STAT. ANN. §§ 50-112 AND 50-161 AND COMMON LAW)

109.    Digital Ally incorporates the allegations contained in paragraphs 1 through 108 of the Complaint.

110.    Together and/or in concert with other, unknown persons, and in violation of Kan. Stat. Ann. § 50-112 and common law, TASER and the persons and entities referred to above have made and entered into agreements, enterprises, arrangements, contracts, agreements, trusts or combinations:

a.    With the purpose of preventing or which tend to prevent full and free competition in the importation or sale of articles imported into Kansas, i.e., body cams; and/or

        b.      Which were designed or which tend to advance, reduce or control the price or cost of any such products or articles, in Kansas.

111.    Such acts were committed or performed by TASER for the purpose and with the effect of injuring competitors and destroying competition.

112.    As provided under Kan. Stat. Ann. § 50-161, Digital Ally as well as competition in the Market have been injured by such unlawful combination of capital, skill or acts, and Digital Ally has suffered loss or damage of the kind which these prohibitions against restraint of trade, in Kansas and elsewhere, are intended to prevent.

113.    Digital's injuries and the injuries to its business and/or property necessarily exceed the sum of $75,000, exclusive of interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Digital Ally prays for:

A.    Judgment in favor of Digital Ally that TASER has infringed the '292 and '452 Patents.

B.    A permanent injunction enjoining TASER, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or privity therewith from infringing the '292 and '452 Patents pursuant to 35 U.S.C. § 283.

C.    Judgment in favor of Digital Ally for all TASER damages suffered by Digital Ally and that TASER be ordered to account for and pay to Digital Ally the damages resulting from TASER's infringement of the '292 and '452 Patents, including lost profits, costs and expenses, together with pre-judgment and post-judgment interest thereon, and all other damages permitted pursuant to 35 U.S.C. § 284, including enhanced damages up to three times the amount

of damages found or measured and costs, and in any event an amount no less than a reasonable royalty.

D.     Judgment and a determination to the effect that this case is exceptional pursuant to 35 U.S.C. § 285.

E.     A judgment and order awarding Digital Ally its attorneys' fees and costs incurred herein pursuant to 35 U.S.C. § 287.

F.     Judgment in favor of Digital Ally and against TASER for such damages as Digital has suffered as a result of conduct forbidden under the anti-trust laws and/or laws prohibiting unreasonable restraints upon competition and/or unlawful, unfair or deceptive conduct, trebled or otherwise enhanced, as provided under 15 U.S.C. § 15, California law and/or Kansas law.

G.     A permanent injunction enjoining TASER, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or in privity therewith, from further violation of, *inter alia*, 15 U.S.C. §§ 1 and/or 13(c), California law and/or Kansas law.

H.     Such other relief as this Court or a jury may deem proper and just under the circumstances, including punitive damages in an amount to be determined by the appropriate triers of fact and law, in an amount sufficient to punish TASER for its conduct and to deter others from like conduct and restitution and attorneys' fees under, *inter alia*, Cal. Bus. Code § 17200.

Dated:  March 18, 2016

Respectfully submitted,

ERISE IP, P.A. (Patent Counsel)

*/s/ Adam P. Seitz*
Adam P. Seitz, KS Bar #21059
Eric A. Buresh, KS Bar #19895
Jason R. Mudd, KS Bar #25749
Erise IP, P.A.
6201 College Boulevard, Suite 300
Overland Park, KS 66211
(913) 777-5600 telephone
(913) 777-5601 fax
Adam.Seitz@eriseIP.com
Eric.Buresh@eriseIP.com
Jason.Mudd@eriseIP.com

Paul R. Hart, *Pro Hac Vice* filed
Erise IP, P.A.
5600 Greenwood Plaza Blvd., Suite 200
Greenwood Village, CO 80111
(913) 777-5600 telephone
(913) 777-5601 fax
Paul.Hart@eriseIP.com

McDOWELL, RICE, SMITH & BUCHANAN

*/s/ James F.B. Daniels*
James F.B. Daniels, KS Fed. Bar #70468
605 W. 47th Street, Suite 350
Kansas City, MO 64112
(816) 753-5400 telephone
(816) 753-9996 fax
jdaniels@mcdowellrice.com

ATTORNEYS FOR PLAINTIFF
DIGITAL ALLY, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of March 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to all attorneys of record linked to this case.

/s/ Adam P. Seitz
Adam P. Seitz