**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

DIGITAL ALLY, INC., a Nevada corporation, )
)
Plaintiff, )
)
)
v. )
)
TASER INTERNATIONAL, INC., a Delaware )
corporation. )
)
Defendant. )
)

Case No.  2:16-cv-02032-CM-TJJ

JURY TRIAL DEMANDED

## DIGITAL ALLY, INC.'S BRIEF IN SUPPORT OF LIFTING THE STAY

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................................... 1

II.     ARGUMENT........................................................................................................................... 2

    A.   **Prejudice to Digital of a Stay/Tactical Disadvantage** ........................................................ 2

    B.   **Stage of the Litigation**.................................................................................................. 8

    C.   **Simplification of Issues** ............................................................................................... 8

III.    CONCLUSION ................................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Allure Energy v. Honeywell Intern., Inc.*, No. 1–15–CV–079 RP, 2015 WL 4207243 (W.D. Tex. July 2, 2015).................................................................................................................... 6

*Davol, Inc. v. Atrium Medical Corp.*, No. 12–958–GMS, 2013 WL 3013343 (D. Del. June 17, 2013) ........................................................................................................................ 4

*Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. CV 15-7025 (RBK/JS), 2016 WL 7165695 (D.N.J. Dec. 7, 2016) ............................................................................................... 8

*Everlight Elecs. Co., Ltd. v. Nichia Corp.*, No. 12–cv–11758, 2013 WL 1821512 (E.D. Mich. April 30, 2013).............................................................................................................. 3

*Norred v. Medtronic, Inc.,* No. 13-cv-2061-EFM/TJJ, 2014 WL 554685 (D. Kan. Feb. 12, 2014) .................................................................................................................... 2, 8, 9

*Procter & Gamble Co. v. Team Technologies, Inc.*, No. 1:12–cv–552, Dkt. No. 64 at 4-5 and 2014 WL 533494 ............................................................................................................. 4

*Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 2:15-CV-349-JRG, 2017 WL 3396399 (E.D. Tex. Jan. 17, 2017)................................................................................................... 8

*Toshiba Samsung Storage Tech. Korea Corp. v. LG Elecs., Inc.*, 193 F. Supp. 3d 345 (D. Del. 2016) ...................................................................................................................... 8

*Universal Electronics, Inc. v. Universal Remote Control, Inc.*, 943 F. Supp. 2d 1028 (C.D. Cal. 2013) ...................................................................................................................... 3

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, No. C 12–05501 SI, 2014 WL 121640 (N.D. Cal. Jan. 13, 2014) ....................................................................................................... 3

I.      **INTRODUCTION**

More than one year into this case and on the verge of a Claim Construction Hearing, TASER International, Inc. ("TASER") asked the Court for a complete stay of litigation on the hope that its second attempt to invalidate Digital Ally, Inc.'s ("Digital's") patents before the Patent Office would be more successful than its first failed attempt. This time, TASER filed four separate *Inter Partes* Review ("IPR") petitions—two against each asserted patent. Digital objected, explaining that TASER had completely failed in a previous effort to invalidate the '292 Patent and would likely fail in its IPR efforts. But, recognizing that the PTAB would issue institution decisions on a rolling basis over the course of the next few months, the Court issued a temporary stay of litigation. As Digital predicted, TASER's IPR petitions were largely a failure—only one of four requested IPRs was instituted and it does not cover all originally asserted claims from the '292 Patent. The other asserted patent, the '452 patent, is free and clear—it has no pending IPR instituted against it. Additionally, having used the entire statutory period to file its four IPR petitions, TASER is now barred from filing any further IPR petitions.

As noted below, the harm to Digital from TASER's ongoing willful infringement has been substantial. TASER is driving Digital out of the marketplace using Digital's own technology. This lawsuit represents one of Digital's best and strongest options for addressing the harm TASER is causing in the marketplace. In order to streamline this case, to ensure the stay is lifted, and to obtain relief from the significant harm caused by TASER's continued infringement of the '452 Patent, Digital made a strategic decision to dismiss the '292 Patent. With the '292 Patent removed and TASER's '452 Patent IPR petitions denied, there is virtually no substantive rationale to stay this litigation against direct competitors.

Since this lawsuit was filed in January 2016, TASER's share of the law enforcement body camera market has dramatically increased at the expense of Digital. As the evidence cited herein demonstrates, TASER's market share has dramatically increased during the pendency of this case while Digital's has dramatically decreased. Put simply, a stay would create a highly detrimental delay for no substantive upside. TASER's continued infringement, as a direct competitor of Digital, creates real and immediate harm to Digital. Time is of the essence.

## II.    ARGUMENT

As the Court recognized in its Memorandum and Order Granting Temporary Stay, courts consider three factors in deciding whether to stay an action pending an IPR: (1) whether discovery is complete and whether a trial date has been set; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party. Dkt. No. 115 at 3 (citing *Norred v. Medtronic, Inc.,* No. 13-cv-2061-EFM/TJJ, 2014 WL 554685, at *1 (D. Kan. Feb. 12, 2014). The final factor considers the severe prejudice Digital would suffer were this litigation to remain stayed until final resolution of the '292 Patent IPR proceeding. Because this prejudice strongly outweighs the other factors, Digital will address it first.

### A.    Prejudice to Digital of a Stay/Tactical Disadvantage

The third factor is whether granting a stay would result in undue prejudice or tactical disadvantage to the nonmoving party. *Norred*, 2014 WL 554685, at *4. In assessing this factor, courts generally consider whether the parties are direct competitors and whether the Defendant delayed in filing for an IPR. *Id*. The Court previously concluded that "the parties appear to be competitors in a relatively small market and therefore any prejudice to Plaintiff from a stay should be examined closely," but reasoned that the "short deadline" within which the PTAB

2

would "determine whether to institute an *inter partes* review" justified a "*temporary* stay of this action." Dkt. No. 115 at 7. TASER's current request to continue the stay indefinitely until the '292 Patent IPR and any associated appeals resolve is a significantly different question than the Court previously analyzed. The IPR proceeding itself will not conclude until June 2018 and, with appeals, the process could easily drag out another 6+ months after that, meaning that a full resolution will not occur until December 2018 or later.

Focusing on the evidence of the parties' direct competition in a small and sticky market, including market share trends up to and including the current temporary stay, it is apparent how severe the harm caused by TASER's infringement has been as well as the very real and dire consequences of continuing to delay resolution of TASER's infringement.

For good reason, courts generally find direct competition in small markets weighs strongly against staying litigation. *See, e.g.*, *Universal Electronics, Inc. v. Universal Remote Control, Inc.*, 943 F. Supp. 2d 1028, 1033-34 (C.D. Cal. 2013) (finding the potential prejudice weighed against stay and noting "infringement among competitors can cause harm in the marketplace that is not compensable by readily calculable money damages" (internal quotations omitted)); *Everlight Elecs. Co., Ltd. v. Nichia Corp.*, No. 12–cv–11758, 2013 WL 1821512, at *8 (E.D. Mich. April 30, 2013) ("Courts routinely deny requests for stay during the pendency of PTO proceedings where the parties are direct competitors."); *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, No. C 12–05501 SI, 2014 WL 121640, at *3-4 (N.D. Cal. Jan. 13, 2014) (denying stay and finding the undue prejudice factor "weighs heavily" against a stay where the parties are direct competitors); *Procter & Gamble Co. v. Team Technologies, Inc.*, No. 1:12–cv–552, Dkt. No. 64 at 4-5 and 2014 WL 533494, at *2-3 (S.D. Ohio Sept. 10, 2013 and Feb. 11, 2014) (denying stay both before and after institution of IPR, largely because the parties were

3

direct competitors); *Davol, Inc. v. Atrium Medical Corp.*, No. 12–958–GMS, 2013 WL 3013343, at *3 (D. Del. June 17, 2013) ("While the 'issue simplification' and 'stage of litigation' factors suggest that a stay might serve the interests of judicial economy, the court is concerned that Davol will suffer undue prejudice should it be forced to continue competing with Atrium's accused products without being permitted to advance its infringement claims.").

Here, Digital Ally and Taser are widely recognized as rivals in the body camera market, a rapidly developing, niche market with a finite number of potential consumers, most of which are police precincts, cities, and security firms. *See, e.g.*, Ex. A, "Digital Ally to Expand Taser Rivalry With Wireless Stun Gun," dated 12-6-2016; Ex. B, "TASER Dominated Body Cam Rival Digital Ally in Q3," dated 11-10-2016. In addition, analysts have recognized the close relationship between these two competitors and the impact that this lawsuit will have on the ultimate marketplace. Ex. C, "Digital Ally, Inc., TASER International, Inc. Stun Short Sellers," dated 12-10-2015 ("Digital Ally, Inc. (NASDAQ:DGLY) has exploded 9.7% today to trade at $5.09, following news that regulators have rejected **rival** TASER International, Inc.'s (NASDAQ:TASR) patent challenge.") (emphasis added).

Unlike typical sales in which consumers assess manufacturers independently for each purchase, the body camera market is "sticky" such that customers are unlikely to change brands once an initial purchase has been made. This is because body cameras are typically tethered to proprietary evidence management systems with long term contracts that lock precincts into a single supplier for many years. *See, e.g.*, Ex. D, "Why Taser Changed Its Name And Offered Every Cop A Body Camera," *Fast Company*, April 6, 2017 (in response to TASER offering free one year trials of its body cameras and evidence retention service, a competitor noted "using [TASER's] software for a year will effectively force police to commit to its service for the

longterm, 'or face exorbitant switching costs'"); Ex. E, "A Private Company Snapped Up A Huge Contract To Provide Body Cameras To The NYPD," *Business Insider*, October 13, 2016 (noting TASER contract worth "only a few million dollars over five years initially" could "last as long as 14 years, rise in size to as many as 18,000 units, and generate revenue of up to $250 million"); Ex. F, "In The Police Body Camera Business, The Real Money's On The Back End," *Marketplace*, April 18, 2017 (Michael White, a criminology professor at Arizona State University, who wrote a Department of Justice guide on body camera procurement, noting that selecting a "proprietary software system," like TASER's, "can chain a department to a particular product"). TASER itself understands the "sticky customer" component of this marketplace and publishes articles advocating the importance of thinking "long term" when choosing an evidence retention platform.  Ex. G, "Choose the Network, Not a Camera," December 6, 2016. Thus, each sale TASER makes using Digital's patented technology removes a customer from the market for an extended period of time (or perhaps permanently). With a limited number of precincts and law enforcement agencies in the country, TASER has a unique opportunity to significantly remove Digital's marketplace opportunities if this case remains stayed.

The prejudice and harm that has already occurred are especially severe in this case. In a short period of time since releasing its body cameras with Digital's patented technology, TASER has locked up 36 of 68 major cities' law enforcement agencies.[1] Courts have recognized the increased harm that can occur in such a situation between lopsided competitors and have refused stays as a result. *See Allure Energy v. Honeywell Intern., Inc.*, No. 1–15–CV–079 RP, 2015 WL 4207243, at *2 (W.D. Tex. July 2, 2015) (finding that a stay was particularly inappropriate where the defendant was a powerful Fortune 100 company and the plaintiff was a small startup).

---

[1] Ex. H, "Axon (Formerly Taser) Grows Like A Weed As It Refocuses On Body Cams," *TechCrunch*, May 9, 2017.

TASER's desire to lock up the entire marketplace is now a full-frontal assault that has even involved a name change to reflect its changing priorities. Since the temporary stay was entered, TASER changed its corporate name "to Axon to reflect the evolution of our company from a weapons manufacturing company to a full solutions provider of cloud and mobile software, connected devices, wearable cameras, and now artificial intelligence." Ex. I, "Taser International, Now Axon, To Offer Free Body Cameras For Every US Police Officer," *CNBC*, April 5, 2017; *see also* Ex. D (noting the name change is part of TASER's "aggressive push to dominate the burgeoning market for body cameras—and the lucrative video and data services those cameras require").

The proof of the harm that Digital has suffered in the marketplace as a result of TASER's dominance is evident in the parties' relevant public financial data. As shown below,[2] the parties were relatively close in body camera revenue when this lawsuit was first filed. In less than two years, however, TASER has dominated the marketplace and gained market share to Digital's significant detriment. This effect is even more apparent in the short time period since the temporary stay was issued (between Q1 2017 and Q2 2017), where the parties' respective revenues have diverged sharply with TASER drastically increasing its share of the small and sticky body camera market.

---

[2] An explanation of the underlying evidence depicted in this demonstrative is provided in the Seitz Declaration at ¶ 16.



Underlying these troubling trends are numerous specific instances in which TASER has secured large contracts in direct competition with Digital. *See, e.g.*, Ex. J, Nevada Award Notice, November 2, 2016 (indicating that Digital lost contract for more than $1MM to TASER); Ex. K, Austin Award Notice, March 8, 2016 (indicating Digital lost contract to TASER); Ex. L, Eugene Award Notice, September 28, 2016 (indicating the same); Ex. M, Albuquerque Award Notice, March 7, 2017 (indicating the same); *see also* Ex. N, "Taser Awarded $4.4 Million Contract for APD Cameras," May 1, 2017 (noting TASER contract with Albuquerque police department worth $4.4MM). As can be seen from these few examples, Digital has lost significant value in direct competition with TASER, and as noted above, once these sales are finalized the customer is highly unlikely to ever change body camera manufacturers in the future.

In sum, there is simply no question that (1) TASER and Digital directly compete in the small and sticky body camera market, (2) the parties' respective portions of the market are drastically diverging, and (3) continued stay of this litigation will cause severe damage to Digital.

**B.     Stage of the Litigation**

Circling back to the first factor, courts consider "the stage of the proceedings, including whether discovery is complete and whether a trial date has been set." *Norred*, 2014 WL 554685, at \*2. Even assuming this factor favors a stay, it does not remotely outweigh the severe prejudice to Digital that would result from keeping a stay in place and permitting TASER to further erode Digital's position in the marketplace using Digital's own patented technology. Indeed, courts routinely deny stays in competitor cases where significantly fewer resources had been expended than in the instant case. *See, e.g.*, *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. CV 15-7025 (RBK/JS), 2016 WL 7165695, at \*8 (D.N.J. Dec. 7, 2016) (denying stay before *Markman* briefs were filed where parties directly compete).

**C.     Simplification of Issues**

The final factor addressed herein asks courts to consider "whether a stay will simplify the issues in question." *Norred*, 2014 WL 554685, at \*3. As a starting point, where less than all asserted claims in a case are under review by the Patent Office, courts routinely deny requests to stay litigation because those Patent Office proceedings cannot possibly resolve the issue before the Court. *See, e.g.*, *Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 2:15-CV-349-JRG, 2017 WL 3396399, at \*1 (E.D. Tex. Jan. 17, 2017) (denying stay against non-competitors where one of five asserted patents and six of 38 asserted claims were instituted); *Eagle View Techs., Inc. v. Xactware Sols., Inc.*, No. CV 15-7025 (RBK/JS), 2016 WL 7165695, at \*1 (D.N.J. Dec. 7, 2016) (denying stay where six of nine asserted patents and four of 46 asserted claims were instituted); *Toshiba Samsung Storage Tech. Korea Corp. v. LG Elecs., Inc.*, 193 F. Supp. 3d 345, 348 (D. Del. 2016) (denying stay of fourth asserted patents where 13 of 43 asserted claims were instituted and litigation was already stayed with respect to three remaining asserted patents).

Here, however, the rationale for stay is even less compelling. After the dismissal of the '292 Patent, the Patent Office will not be reviewing a single asserted patent claim in this litigation.[3] Nonetheless, Digital understands that TASER will continue to push for a stay by arguing that the '292 IPR proceeding could have some relevance to the litigation involving the '452 patent (such as the claim construction process). Of course, the question is not whether the issues before the Patent Office will have some relevance to the litigation. The question the Court must answer is whether the IPR of an unasserted patent will "simplify the issues in question"— *Norred*, 2014 WL 554685, at *3. Namely, will the issues of infringement and validity of the '452 Patent and, if TASER prevails, its '292 Patent counterclaim be simplified by the resolution of the '292 IPR. And on this point the answer is clear—the IPR proceeding for the '292 Patent will not simplify the litigation during the pendency of the IPR. Claim construction, discovery, and expert reports must still be accomplished regardless of the outcome of '292 IPR. Indeed, those tasks can move forward wholly without impact from the IPR. To the extent the conclusion of the IPR has any relevance to TASER's counterclaim it will only be on one minor issue (i.e., materiality) and this can be easily accommodated with an expert report supplementation.

Though it is difficult to tell what TASER's position is (or has been) on issue simplification, TASER vaguely suggested that some statement made by Digital during the '292 IPR could prove relevant to claim construction in the current litigation. This argument fails for at least one critical reason—with respect to Digital, the IPR record is already closed. A Patent Owner has two opportunities to introduce evidence and arguments in an IPR proceeding—a Preliminary Patent Owner Response ("POPR"), which is filed pre-institution, and a Patent

---

[3] The dismissal of the '292 patent is not currently in dispute. TASER has admitted that it does not oppose Digital's dismissal of the '292 patent from the litigation. Dkt. No. 139 at 1 (TASER noting the "Court should not hesitate to dismiss Digital's '292 Patent claim with prejudice"). The only remaining dispute is the disposition of TASER's counterclaim.

Owner Response ("Response") filed post-institution. Even the oral argument is limited to the existing record—the patent owner "may only present arguments relied upon in the papers previously submitted" and may present "no new evidence or arguments." PTAB Trial Practice Guidelines, Vol. 77, No. 157, 48768 (Aug. 14, 2012). Digital filed its POPR on March 14, 2017 and its Response on September 12, 2017. Thus, to the extent Digital makes any representations in the IPR regarding claim scope relevant to the claim construction process, those representations are already part of the record and can be relied upon by TASER with no need to wait for further developments in the IPR proceeding.

Finally, Digital also anticipates that TASER will use the currently pending motion to dismiss the '292 Patent and related counterclaim (Dkt. No. 132) as a basis to maintain the stay. It is unclear what arguments TASER may advance on this point, but one point is clear at this juncture. To the extent TASER is permitted to independently maintain its '292 Patent counterclaim of unenforceability, any claim construction issues that need to be addressed for said counterclaim may be addressed with the '452 Patent claim construction issues that will proceed whatever the outcome of the pending motion to dismiss. As noted above, the record is closed and no new evidence relevant to claim construction can be entered in the IPR process. Thus, claim constriction issues for either the '292 Patent or '452 Patent are ripe and ready for adjudication.

## III.   CONCLUSION

For the reasons stated above, Digital respectfully requests that the Court lift its temporary stay of litigation and set an expedited scheduling conference to permit the parties and the Court to set reasonable deadlines for a *Markman* hearing and further pre-trial deadlines.

DATE:  October 2, 2017

Respectfully submitted,
ERISE IP, P.A.

/s/  Adam P. Seitz_____
Adam P. Seitz, KS Bar #21059
Eric A. Buresh, KS Bar #19895
Jason R. Mudd, KS Bar #25749
Erise IP, P.A.
6201 College Boulevard, Suite 300
Overland Park, Kansas 66211
Telephone: (913) 777-5600
adam.seitz@eriseip.com
eric.buresh@eriseip.com
jason.mudd@eriseip.com

Paul R. Hart, admitted *Pro Hac Vice*
CO Bar No 45697
Erise IP, P.A.
5600 Greenwood Plaza Blvd., Suite 200
Greenwood Village, CO 80111
Telephone: (913) 777-5600
paul.hart@eriseip.com

James F.B. Daniels, KS Fed. #70468
McDOWELL, RICE, SMITH &
BUCHANAN
605 W. 47th Street, Suite 350
Kansas City, MO 64112
(816) 753-5400 telephone
(816) 753-9996 fax
jdaniels@mcdowellrice.com

*Counsel for Plaintiff Digital Ally, Inc.*

11

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of October, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to all attorneys of record linked to this case.

/s/  Adam P. Seitz

Adam P. Seitz, KS Bar #21059
Erise IP, P.A.
6201 College Boulevard, Suite 300
Overland Park, Kansas 66211
Telephone: (913) 777-5600
adam.seitz@eriseip.com

*Counsel for Plaintiff Digital Ally, Inc.*

12