# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

DIGITAL ALLY, INC.

                Plaintiff,

v.

                                     Case No. 2:16-cv-02032

TASER INTERNATIONAL, INC.

                Defendant.

## DEFENDANT TASER INTERNATIONAL, INC.'S RESPONSIVE BRIEF IN SUPPORT OF MAINTAINING THE STAY IN THIS CASE PENDING *INTER PARTES* REVIEW

## TABLE OF CONTENTS

I.     INTRODUCTION. ........................................................................................................ 1

II.    ARGUMENT. ............................................................................................................... 1

    A.   As the Court Has Determined, the Stage of Litigation Favors a Stay. ................... 3

    B.   The Full Intrinsic Record in the '292 IPR Will Streamline the Litigation on the Closely Related '452 Patent. ................................................................................. 3

    C.   A Stay Does Not Result in Undue Prejudice to Digital. ........................................ 7

III.   CONCLUSION. ......................................................................................................... 10

**TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Aylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353 (Fed. Cir. 2017) .........................................4, 6

*Braintree Labs, Inc. v. Nephro-Tech, Inc.*, Case No. 96-2459-JWL, 1997 WL
   94237 (D. Kan. Feb. 26, 1997) ......................................................................2, 3, 4

*Broadcast Innovation, LLC v. Charter Commc'n, Inc.*, No. 03-cv-2223, 2006 WL
   1897165 (D. Colo. July 11, 2006)...............................................................................2

*Corel Software, LLC v. Microsoft Corp.*, Case No. 2:15-cv-528-JNP-PMW, 2016
   WL 4444747 (D. Utah Aug. 23, 2016) ...............................................................2, 7

*Digital Ally, Inc. v. Utility Associates*, 2:14-cv-02262-CM (D. Kan.) ...........................................8

*Digital Ally, Inc. v. Utility Associates, Inc.*, 2:13-cv-02550-SAC-KGS (D. Kan.) ......................8

*Fusion Specialties, Inc. v. China Network Leader, Inc.*, Civil Action No. 12-cv-
   00009-CMA-KMT, 2012 WL 3289077 (D. Colo. Aug. 11, 2012) .................................2, 3, 10

*Gould v.* Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983)............................................3

*Ignite USA, LLC v. Pac. Mkt. Int'l*, LLC, NO. 14 C 856, 2014 WL 2505166 (N.D.
   Ill. May 29, 2014) ......................................................................................7, 8, 9

*Norred v. Medtronic, Inc.*, No. 13-2061-EFM-TJJ, 2014 WL 554695 (D. Kan.
   Feb. 12, 2014) (James, J.) ................................................................................ passim

*Proctor & Gamble Co. v. Team Tech., Inc.*, No. 1:12-cv-552, 2013 WL 4830950
   (S.D. Ohio Sept. 10, 2013)..........................................................................................2

*ScriptPro LLC v. Wal-Mart Stores, Inc.*, No. 05-2244-CM, 2006 WL 2294859 (D.
   Kan. Aug. 8, 2006) (Murguia, J.)..............................................................................2

*VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307 (Fed. Cir. 2014) ..................................3

*Vivint, Inc. v. Alarm.com Inc.*, Case No. 2:15-cv-392 CW, 2016 WL 4750176 (D.
   Utah Sept. 12, 2016) ................................................................................2, 4

*White Knuckle IP, LLC v. Electronic Arts Inc.*, Case No. 1:15-cv-00036-DN-
   BCW, 2016 WL 3959689 (D. Utah July 20, 2016) ..............................................2

*Wonderland Nursery Goods Co., Ltd. v. Baby Trends, Inc.*, No. EDCV 14-01553-
   VAP, 2015 WL 1809309 (C.D. Cal. Apr. 20, 2015) ..............................................7

## I.      INTRODUCTION.

The '292 IPR clearly impacts this case.  The '292 and '452 patents share claim terms and the same specification.  The law in this Circuit and District support a stay.  The Federal Circuit's recent *Aylus* decision also confirms Digital's IPR arguments will be binding here.  Moreover, that IPR record is not "closed."  Digital has filed a motion to cancel and substitute the '292 claims to add a limitation from the '452 patent.  If granted, that motion will result in additional expert submissions and depositions.  Digital will also present hearing arguments and the PTAB will issue a final, written decision.

Congress created the IPR process to allow just, speedy, and inexpensive resolution of patent disputes as an alternative to litigation.  Here, Digital has repeatedly changed its claim construction positions.  Judge Murguia has not yet addressed the issue.  The Court should maintain the stay until Digital finally commits to positions during IPR, and is bound by them.

Digital essentially asks the Court to limit its stay analysis to alleged prejudice.  This approach violates Federal Circuit law.  "Undue" prejudice is only one factor, and is not dispositive either way.  As for the facts, Digital now contradicts itself.  Digital publicly admitted it did not care whether TASER sold its allegedly-infringing products during this litigation.  Digital also made a deliberate decision not to seek injunctive relief.  Now, Digital claims TASER is causing it "severe" and "significant" harm.  But TASER is not responsible for Digital's product defects, or for Digital's inability to succeed in a market with many other competitors.  In short, the law and facts do not support lifting the stay.

## II.     ARGUMENT.

Digital refuses to acknowledge the cases from this District and other Tenth Circuit courts embracing a "liberal policy in favor of granting motions to stay pending the outcome of [the USPTO's] reexamination or reissuance proceeding."  *See Norred v. Medtronic, Inc.*, No. 13-

2061-EFM-TJJ, 2014 WL 554695, at *1 (D. Kan. Feb. 12, 2014) (James, J.) (granting stay); *see Braintree Labs, Inc. v. Nephro-Tech, Inc.*, Case No. 96-2459-JWL, 1997 WL 94237, at *9 (D. Kan. Feb. 26, 1997); *ScriptPro LLC v. Wal-Mart Stores, Inc.*, No. 05-2244-CM, 2006 WL 2294859, at *1 (D. Kan. Aug. 8, 2006) (Murguia, J.); *Vivint, Inc. v. Alarm.com Inc.*, Case No. 2:15-cv-392 CW, 2016 WL 4750176, at *2 (D. Utah Sept. 12, 2016); *Corel Software, LLC v. Microsoft Corp.*, Case No. 2:15-cv-528-JNP-PMW, 2016 WL 4444747, at *2 (D. Utah Aug. 23, 2016); *White Knuckle IP, LLC v. Electronic Arts Inc.*, Case No. 1:15-cv-00036-DN-BCW, 2016 WL 3959689, at *2 (D. Utah July 20, 2016); *Fusion Specialties, Inc. v. China Network Leader, Inc.*, Civil Action No. 12-cv-00009-CMA-KMT, 2012 WL 3289077, at *1 (D. Colo. Aug. 11, 2012).[1]

The three analytical factors to consider are: (1) stage of the litigation; (2) simplification of issues; and (3) prejudice. *See generally Norred*, 2014 WL 554685, at *1. (*See* Doc. No. 142 at 3.) "*[N]one of these factors is controlling*; rather, courts determine whether a stay is appropriate based on the totality of the circumstances." *Fusion Specialties*, 2012 WL 3289077, at *2 (emphasis added); *see Broadcast Innovation, LLC v. Charter Commc'n, Inc.*, No. 03-cv-2223, 2006 WL 1897165, at *4 (D. Colo. July 11, 2006).

Here, Digital concedes the stage of the litigation favors a stay. It avoids discussing the close relationship between the asserted patents, or how the parties' statements made or the PTAB's ultimate findings in the '292 IPR will affect litigation on the '452 patent. Lastly, Digital expends significant efforts arguing that TASER is solely responsible for Digital's failures in the

---

[1] As it did in earlier briefing this spring, Digital continues to cite case law from circuit courts that do not have liberal policies in favor of granting stays. (*See* Doc. No. 141, Digital Br. at 4.) *See e.g., Proctor & Gamble Co. v. Team Tech., Inc.*, No. 1:12-cv-552, 2013 WL 4830950, at *1 (S.D. Ohio Sept. 10, 2013) (cautioning "that a court must tread carefully in granting a stay of proceedings"). Instead, Digital chose to litigate in this District.

market and that prejudice to Digital is "severe" and "significant."  This clashes with Digital's statements to its investors, its public filings with the SEC, and its own product failures.

### A.    As the Court Has Determined, the Stage of Litigation Favors a Stay.

Digital does not contest that this factor favors a stay.  (Doc. No. 141, Digital Br. at 8.) Instead, it argues that undue prejudice outweighs it.  But this first factor is not superfluous.  In fact, the Federal Circuit has reversed the denial of a stay, finding an abuse of discretion, where a district court ruled "the benefits of a stay at this relatively early stage of the proceedings are outweighed by various other considerations" including alleged undue prejudice.  *VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1315 (Fed. Cir. 2014) (instead finding the early stage of litigation "heavily favor[ed] a stay").  When analyzed properly under the totality of the circumstances, this factor strongly supports maintaining the stay.  (*See* Doc. No. 115, Stay Order at 4; Doc. No. 142, TASER Br. at 3-4.)

### B.    The Full Intrinsic Record in the '292 IPR Will Streamline the Litigation on the Closely Related '452 Patent.[2]

A key purpose of staying litigation pending USPTO review is to "facilitate trial of [an] issue by providing the district court with the expert view of the [US]PTO."  *Braintree*, 1997 WL 94237, a *8 (citing *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed. Cir. 1983)).  Stays pending IPR permit both parties to "test the validity of United States patents in an efficient and relatively inexpensive manner."  *Braintree*, 1997 WL 94237, at *9.  Parallel litigation and IPR proceedings here would require multiple claim construction exercises, as well as supplemental contention exchanges, expert reports, and/or fact discovery.  *See Norred*, 2014 WL 554685, at *3; *Fusion Specialties*, 2012 WL 3289077, at *2.  Respectfully, the Court should avoid this result.

---

[2] A request for rehearing for one of the '452 IPR petitions remains pending.

Both parties agree this factor turns on whether a stay will "simplify the issues in question." (*See* Doc. No. 141, Digital Br. at 8; Doc. No. 142, TASER Br. at 4.)  But Digital's interpretation of "simplify" is flawed, apparently requiring that the '292 IPR resolve the '452 litigation entirely. (*See* Doc. No. 141, Digital Br. at 9.)  Rather, "the question is merely whether the issues will be simplified, and *not whether the entire case will be resolved*." *See Vivint*, 2016 WL 4750176, at *3 (emphasis added).   Digital's interpretation also disregards the Court's practical approach to analyzing the efficacy of a stay.  *See generally Norred*, 2014 WL 554685, at *4.

This District has identified a number of advantages "to allowing [USPTO] reexamination before litigation" beyond just case resolution.  For example, stays have the added benefits of permitting the prior art to be "first considered by the [US]PTO, with its particular expertise," alleviating "discovery problems relating to prior art," encouraging "settlement without the further use of the Court," "reducing the complexity and length of the litigation" by entering the intrinsic record at trial, and reducing the cost of litigation.  *Braintree*, 1997 WL 94237, at *9.  Issue simplification simply does not require complete overlap.  (*See* Doc. No. 142, TASER Br. at 4 (string citing grants of stay where less than all patents were under USPTO review).)  Any one of these cost-saving benefits justifies maintaining the stay here.

Moreover, the Federal Circuit recently confirmed district courts can—and should—consider a patent owner's statements during IPR so "that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers."  *See Aylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353, 1359-60 (Fed. Cir. 2017).  All of the cases Digital cites that denied a stay pre-date this *Aylus* decision.  Those cases also do not consider how prosecution history estoppel affects litigation.   More importantly, the *Aylus* holding is

particularly relevant here because Digital has changed positions multiple times during this litigation on claim construction, its asserted claims, and even this stay.

Digital's first argument for this factor appears to be based on percentages. (Doc. No. 141, Digital Br. at 8-9.) Digital cites several cases denying stays where some small percentage of asserted claims was under USPTO review. (*Id.*) Incidentally, those cases did not apply a liberal policy in favor of granting stays. (*See* Doc. No. 142, TASER Br. at 4.) Nor are they similar to this case. Here, over 75% (or 26 out of 34) of the presently-asserted claims are under review (taking both patents into account). Even if Judge Murguia dismisses the '292 patent, statements and events occurring in the '292 IPR will affect the scope of the '452 patent. For instance, 100% of the asserted claims of the '452 patent require a "recording device," a "recording device manager," and "metadata," the constructions and scope of which the PTAB will address in the '292 IPR. Also, all of the '452 patent claims—not just those asserted—risk being found unenforceable by inequitable conduct due to the ICOP 20/20 prior art—the same art being scrutinized in the '292 IPR.

Digital's second argument is, "the IPR proceeding for the '292 Patent will not simplify the litigation during the pendency of the IPR." (Doc. No. 141, Digital Br. at 9.) This belies an essential fact that Digital cannot escape: the '292 and '452 patents are part of the same patent family, claim the same invention, share the same patent specification, and have much of the same prosecution history. Arguments made and decisions rendered in the '292 IPR will assuredly affect the '452 patent.

Interestingly, in the IPR Digital acknowledges the patents' similarities. It is seeking to cancel the '292 claims and import limitations from the '452 patent (relating to the locations where data are stored) to try to avoid invalidity. The parties' arguments during IPR will thus

address not only the ICOP 20/20 prior art, but potentially other references as well, including those analyzed during the '452 patent's prosecution and IPR history.  This may affect the scope and validity of the '452 patent.   In light of this overlap, Digital cannot credibly argue the '292 IPR will not simplify issues relating to the '452 patent.   Recognizing these efficiencies, numerous courts grant stays when less than all patents or claims are in IPR.  (*See* Doc. No. 142, TASER Br. at 4.)  This case is no different.

Digital acknowledges the '292 IPR will likely affect materiality issues relating to TASER's inequitable conduct counterclaims for *both* asserted patents.  (*See* Doc. No. 141, Digital Br. at 9 (conceding relevance of ICOP prior art on issues of materiality for TASER's counterclaims).)  Digital also admits that if the Court were to lift the stay here, the parties would have to "supplement"—in other words, potentially re-do—their expert reports to account for the PTAB's final written decision.  And the fact that Digital has already moved to amend its claims in the '292 IPR is highly indicative of materiality for inequitable conduct purposes.  *See Aylus*, 856 F.3d at 1359-60.  It is in the Court's and the parties' interest to allow the PTAB to complete the '292 IPR record.

Digital's final argument that the IPR "record is closed" is profoundly mistaken.  (*See* Doc. No. 141, Digital Br. at 9-10.)  The '292 IPR record is far from complete.  Regardless of the PTAB's decision on Digital's motion to cancel and substitute claims, the parties will be submitting additional arguments on both the proposed new claims and the original claims (including the overlapping claim terms).  The parties will also make final presentations at a hearing and the PTAB will issue a final written decision—the outcome of the IPR.  Digital omits all of these additional events, which will provide significant insight into the scope of the asserted patents.  (*See* Doc. No. 142, TASER Br. at 6.)  Because the intrinsic record is still being

developed, Digital's suggestion that there is "no need to wait for further developments in the IPR proceeding" invites waste and duplication if the stay is lifted.

### C.    A Stay Does Not Result in Undue Prejudice to Digital.

Courts take a practical approach to analyzing undue prejudice.  *See Norred*, 2014 WL 554685, at *4.  At base, this assesses whether "monetary damages are sufficient to compensate for harm during a potential stay."  *Wonderland Nursery Goods Co., Ltd. v. Baby Trends, Inc.*, No. EDCV 14-01553-VAP (SPx), 2015 WL 1809309, at *4 (C.D. Cal. Apr. 20, 2015).  Where the market includes several other competitors, "[t]hese competitors' existence undermines [plaintiff's] argument that it will lose market share simply due to [defendant's] alleged infringement."  *See Ignite USA, LLC v. Pac. Mkt. Int'l*, LLC, NO. 14 C 856, 2014 WL 2505166, at *3 (N.D. Ill. May 29, 2014) (finding plaintiff's undue prejudice arguments belied by existence of at least four other competitors in the market).

Digital has already admitted during this litigation that money damages will suffice to compensate for its alleged harm.  It did not move for preliminary injunctive relief, which is highly indicative of no undue prejudice.  (*See* Doc. No. 142, TASER Br. at 9-10.)  When asked why it did not move for such relief, despite the "significant" and "severe" harm it feigns here, Digital's CFO declared that "if [TASER] wants to continue to sell [the infringing technology], so be it, it will just add to the damages that will be awarded at the end."  (Doc. Nos. 113 at 7, 113-2 at 20, 142 at 9.)[3]  This admission is also consistent with Digital's recent statement that it is "looking at different ways to monetize the patent, monetize the VuLink patent which embodies our '452 and '292 patent."  (Ex. A, Tr. at 3, "Digital Ally, (DGLY) CEO Stan Ross on Q2 2017

---

[3] *See Corel Software*, 2016 WL 4444747, at *2 (finding where a plaintiff did not move for preliminary injunctive relief that a "prior lack of urgency in this matter belies [any] insistence that the litigation move forward with all dispatch now") (quotemark omitted).

Results," Aug. 15, 2017.)  Because Digital previously admitted it did not care whether TASER continued to sell its products, and that money damages will suffice, there is no undue prejudice.

Recognizing this problem, Digital now advances a colorful narrative:  that it and TASER are locked in an intense, head-to-head duel for a handful of law enforcement bids for body-worn camera technology.  But as noted in previous filings, Digital cannot credibly attribute any undue prejudice to TASER.  (Doc. No. 113 at 4.)

First, there is no evidence of a contentious rivalry, apart from Digital instituting this litigation.   The parties are two out of dozens of companies marketing body-worn camera technology.  Many of those other companies also consistently outperform Digital.  (Doc. No. 112-8 at 1-3, 1-4, 1-5 (Digital's exhibit in earlier briefing identifying over 35 competitor entities).)  In *Ignite*, the presence of only four other competitors was powerful evidence of no undue prejudice.  2014 WL 2505166, at *3.  Here, there are many more.

Digital blames TASER for losing several bids.  (Doc. No. 141, Digital Br. at 7; Doc Nos. 141-11 through 141-15.)  But Digital does not mention it also failed to compete successfully with several other companies submitting proposals for those bids, not just TASER.  For the City of Austin, Digital's proposal came in last among four submitted proposals.  (Doc. No. 141-12 at 3.) In Albuquerque, TASER actually competed with Utility Associates,[4] not Digital.  (Doc. No. 141-15 at 2.)  An Albuquerque councilor described TASER and Utility Associates as the "only two contractors able to provide the Albuquerque Police Department with what it needs, given the department's size."  (*Id.*)  The City of Eugene, Oregon selected TASER "out of 13 body camera vendors that submitted proposals."  (*See* Ex. B, "Eugene police officers will be wearing body cameras starting Thursday," June 22, 2017.)  Next, publicly available information from the State

---

[4] Notably, Digital has been embroiled in litigation with Utility Associates for years. (*See Digital Ally, Inc. v. Utility Associates, Inc.*, 2:13-cv-02550-SAC-KGS (D. Kan.); *Digital Ally, Inc. v. Utility Associates*, 2:14-cv-02262-CM (D. Kan.).)

of Nevada indicates that 11 entities submitted proposals to provide body-worn camera technology. (*See* Ex. C, Amendment 1 to Request for Proposal 3273, Sept. 14, 2016.) As previously noted, the Seattle, Washington Police Department also ranked Digital last among six competing companies. (*See* Doc. No. 113 at 12.) Digital cannot show that it competed head-to-head with TASER, or that Digital would have won any particular bid in TASER's absence.[5] This undermines Digital's insistence that it will lose market share simply due to TASER's alleged infringement. *See Ignite*, 2014 WL 2505166, at *3.[6]

Even where law enforcement agencies award Digital contracts for body-worn camera technology, its products fail. In Elkhart, Indiana, the police department suspended use of Digital's body cameras "due to high failure rate." (Doc. No. 109-9 at 2.) The Michigan State Police blamed Digital's dash-cam video system for malfunctioning during a routine traffic stop where an octogenarian's arm was broken in an apparent scuffle with police. (*See* Ex. D, "State Police: dash cam footage failure manufacturer's fault," Apr. 11, 2017.) The state police said "it found the defect in other cameras in other patrol vehicles from other posts around the state." (*Id.*) Digital has also had to correct contaminated circuit boards for its body-worn cameras across its customer footprint, affecting its 2016 profitability. (Doc. No. 109-10 at 2-3.)

Digital recognizes these weaknesses. In its 2016 10-K filing with the SEC, Digital stated that many of its competitors—plural—"have significant advantages over us, including greater

---

[5] Digital's "revenue chart" (*see* Doc. No. 141, Digital Br. at 7), created by counsel, combines different asserted percentages with general cites to an undifferentiated mass of hundreds of pages of financial disclosures. It is unclear how counsel generated these numbers (as opposed to one of Digital's financial officers). Nor is it clear how this chart can be offered to contradict Digital's previous statements as a public company in its quarterly earnings calls during this litigation. In short, there is no competent evidence that any alleged revenue difference is attributable to TASER, as opposed to the Digital product and marketing failures that third parties have independently confirmed.

[6] Moreover, almost all the bids Digital now complains of occurred in 2016—contemporaneously with Digital's decision *not* to seek an injunction, and its statement that money damages would suffice.

financial, technical, marketing and manufacturing resources, more extensive distribution channels, larger customer bases and faster response times to adapt new or emerging technologies and changes in customer requirements."[7]  (Ex. E at 13, excerpted Digital Ally Form 10-K, for fiscal year ended Dec. 31, 2016 (further naming as competitors *ten* other companies[8]).)  But to avoid a stay here, Digital insists that only TASER is to blame for its business difficulties.  This is speculative, readily discredited, and should be rejected.  *See Fusion Specialties*, 2012 WL 3289077, at *3 (rejecting as speculative that the defendant would usurp market share, "resulting in difficult to measure losses").

The credible evidence is clear.  It is also confirmed by Digital's public statements and decision not to seek injunctive relief.  This factor weighs in favor of a stay.

## III.   CONCLUSION.

All three factors support a stay.  For the reasons discussed above, as well as in TASER's opening brief, the Court should continue the current stay until IPR proceedings are complete for the asserted patents.

---

[7] Digital's insinuation that it is akin to a startup is not accurate. (Doc. No. 141, Digital Br. at 5 (referring to "lopsided competition").)  Digital was formed in 2004, and as of Dec. 31, 2016, employs over 150 people.  (Ex. E at 4.)  Its website states it has secured contracts and orders "in all 50 states and more than 90 foreign countries."  (Ex. F.)  Digital also misrepresents an online news article it cites, which actually states, "36 of 68 major cities' law enforcement agencies had bought *either Axon cameras or Evidence.com service (or both)*."  (Doc. No. 141-9 at 3 (emphasis added).)  Digital neglects to point out that TASER's Evidence.com is not an accused product.  In addition, statistics provided by the Department of Justice show that there are nearly 18,000 law enforcement agencies in the U.S., across local, county, state, and federal agencies.  (Ex. G, "National Sources of Law Enforcement Data," rev. Oct. 4, 2016.)

[8] Publicly available in its entirety at *https://www.sec.gov/Archives/edgar/data/1342958/000149315217002889/form10-k.htm.*

Respectfully submitted,


DATE: October 12, 2017


*/s/ Lynn C. Herndon*
B. Trent Webb (KS Bar # 15965)
bwebb@shb.com
John D. Garretson (D. Kan. # 78465)
jgarretson@shb.com
Zach Chaffee-McClure (KS Bar # 23479)
zmcclure@shb.com
Lynn C. Herndon (D. Kan. # 78369)
lherndon@shb.com
SHOOK, HARDY & BACON LLP
2555 Grand Blvd.
Kansas City, MO  64108-2613
Phone: 816-474-6550
Fax: 816-421-5547


Pamela B. Petersen (*Admitted Pro Hac Vice*)
Axon Enterprise, Inc.
17800 North 85th Street
Scottsdale, Arizona 85255-9603
Phone: (623) 326-6016
Fax: (480) 905-2027
*ppetersen@axon.com*
Secondary: legal@axon.com
**Counsel for Axon Enterprise, Inc. (formerly TASER International, Inc.)**


## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of October 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System, which will send a notice of electronic filing to all attorneys of record linked to this case.


*/s/ Lynn C. Herndon*
Lynn C. Herndon

11